**Slip Op. 00-146**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____
                                         :
TRANSCOM, Inc.,                          :
                                         :
          Plaintiff,                     :
                                         :
L & S BEARING COMPANY,                   :
                                         :
          Plaintiff-Intervenor,          :
                                         :
     v.                                  :    Court No. 97-02-00248
                                         :
THE UNITED STATES,                       :
                                         :
          Defendant,                     :
                                         :
THE TIMKEN COMPANY,                      :
                                         :
          Defendant-Intervenor.          :
_____:

Plaintiff Transcom, Inc. ("Transcom"), a United States corporation, moves pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the United States Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Final Results of Antidumping Duty Administrative Review and Revocation in Part of Antidumping Duty Order on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China ("Final Results"), 62 Fed. Reg. 6189 (Feb. 11, 1997). Specifically, Transcom contends that Commerce: (1) failed to provide notice to Transcom and Transcom's Hong Kong exporters as required under 19 U.S.C. §§ 1675(a), 1677e(b)(1994) and 19 C.F.R. § 353.22(a),(c) (1994); (2) unlawfully resorted to punitive use of best information available in determining the antidumping rate applicable to Transcom's entries from Transcom's Hong Kong exporters in violation of 19 U.S.C. § 1675(a) and 19 C.F.R. §§ 353.22, 355.37; and (3) by doing so, deprived Transcom of its Fifth Amendment Due Process rights.

**Held:** Transom's USCIT R. 56.2 motion is denied. Case dismissed.

Dated: November 7, 2000

Neville, Peterson & Williams (George W. Thompson, John M. Peterson and Curtis W. Knauss) for plaintiff.

Cohen Darnell & Cohen, P.L.L.C. (Mark A Cohen) for plaintiff-intervenor.[1]

David W. Ogden, Assistant Attorney General; David M. Cohen, Director; Commercial Litigation Branch, Civil Division, United States Department of Justice (Henry R. Felix); of counsel: Mildred E. Steward, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for defendant.

Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr. and Amy S. Dwyer) for defendant-intervenor.

**OPINION**

**TSOUCALAS, Senior Judge:** Plaintiff, Transcom, Inc. ("Transcom"), a United States corporation, moves pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the United States Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Final Results of Antidumping Duty Administrative Review and Revocation in Part of Antidumping Duty Order on Tapered Roller

---

[1] L & S Bearing Company has intervened in this action but filed neither motion for judgment upon the agency record nor supporting brief.

<u>Bearings and Parts Thereof, Finished and Unfinished, From the</u> <u>People's Republic of China</u> ("<u>Final Results</u>"), 62 Fed. Reg. 6189 (Feb. 11, 1997). Specifically, Transcom contends that Commerce: (1) failed to provide notice to Transcom and Transcom's Hong Kong exporters as required under 19 U.S.C. §§ 1675(a), 1677e(b)(1994) and 19 C.F.R. § 353.22(a),(c) (1994); (2) unlawfully resorted to punitive use of best information available in determining the antidumping rate applicable to Transcom's entries from Transcom's Hong Kong exporters in violation of 19 U.S.C. § 1675(a) and 19 C.F.R. § 353.22, 355.37; and (3) by doing so, deprived Transcom of its Fifth Amendment Due Process rights.

**BACKGROUND**

This case concerns the seventh administrative review of the antidumping duty order on tapered roller bearings ("TRBs") and parts thereof, finished and unfinished, imported from the People's Republic of China ("PRC") during the period of review ("POR") covering June 1, 1993, through May 31, 1994. Commerce published the preliminary results on September 26, 1995. <u>See</u> <u>Preliminary</u> <u>Results of Antidumping Administrative Review on Tapered Roller</u> <u>Bearings and Parts Thereof, Finished and Unfinished, From the</u>

People's Republic of China ("<u>Preliminary Results</u>"), 60 Fed. Reg. 49,572.   Commerce published <u>Final Results</u> on February 11, 1997. <u>See</u> 62 Fed. Reg. 6189.

Since this administrative review was initiated before December 31, 1994, the applicable statutory provisions are those that existed prior to January 1, 1995, the effective date of the amendments made by the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994) (effective Jan. 1, 1995).

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a)(2) (1994) and 28 U.S.C. § 1581(c) (1994).

## STANDARD OF REVIEW

In reviewing a challenge to Commerce's final determination in an antidumping administrative review, the Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

I.    **Substantial Evidence Test**

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (citations omitted). Moreover, "[t]he court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" American Spring Wire Corp. v. United States, 8 CIT 20, 22, 590 F. Supp. 1273, 1276 (1984) (quoting Penntech Papers, Inc. v. NLRB, 706 F.2d 18, 22-23 (1st Cir. 1983) (quoting, in turn, Universal Camera, 340 U.S. at 488)).

II.    **Chevron Two-Step Analysis**

To determine whether Commerce's interpretation and application

of the antidumping statute is "in accordance with law," the Court must undertake the two-step analysis prescribed by Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Under the first step, the Court reviews Commerce's construction of a statutory provision to determine whether "Congress has directly spoken to the precise question at issue." Id. at 842. "To ascertain whether Congress had an intention on the precise question at issue, [the Court] employ[s] the 'traditional tools of statutory construction.'" Timex V.I., Inc. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing Chevron, 467 U.S. at 843 n.9). "The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning. Because a statute's text is Congress's final expression of its intent, if the text answers the question, that is the end of the matter." Id. (citations omitted). Beyond the statute's text, the tools of statutory construction "include the statute's structure, canons of statutory construction, and legislative history." Id. (citations omitted); but see Floral Trade Council v. United States, 23 CIT ___,___ n.6, 41 F. Supp. 2d 319, 323 n.6 (1999) (noting that "[n]ot all rules of statutory construction rise to the level of a canon, however") (citation omitted).

If, after employing the first prong of Chevron, the Court determines that the statute is silent or ambiguous with respect to the specific issue, the question for the Court becomes whether Commerce's construction of the statute is permissible. See Chevron, 467 U.S. at 843. Essentially, this is an inquiry into the reasonableness of Commerce's interpretation. See Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Provided Commerce has acted rationally, the Court may not substitute its judgment for the agency's. See IPSCO, Inc. v. United States, 965 F.2d 1056, 1061 (Fed. Cir. 1992); see also Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (holding that "a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another"). The "[C]ourt will sustain the determination if it is reasonable and supported by the record as a whole, including whatever fairly detracts from the substantiality of the evidence." Negev Phosphates, Ltd. v. United States Dep't of Commerce, 12 CIT 1074, 1077, 699 F. Supp. 938, 942 (1988) (citations omitted). In determining whether Commerce's interpretation is reasonable, the Court considers the following non-exclusive list of factors: the express terms of the provisions at issue, the objectives of those provisions and the objectives of

the antidumping scheme as a whole.  <u>See</u> <u>Mitsubishi Heavy Indus. v.</u>
<u>United States</u>, 22 CIT ___, ___, 15 F. Supp. 2d 807, 813 (1998).


**III. <u>Southern Cal. Edison Co.</u> Analysis**

If the language of a regulation validly implemented under the
<u>Chevron</u> test speaks unambiguously to the issue at hand, the precise
letter of this regulation must be followed.  <u>See</u> <u>Christensen v.</u>
<u>Harris County</u>, 120 S. Ct. 1655, 1663 (2000).  Otherwise, the
Court's deference to a contrary agency position would "permit the
agency, under the guise of interpreting a regulation, to create <u>de</u>
<u>facto</u> a new regulation."  <u>Id.</u>

Conversely, an agency's interpretation of its own regulation
is entitled to deference when the language of the regulation is
ambiguous or the regulation is silent about the issue at hand.  <u>See</u>
<u>id.</u> (citing <u>Auer v. Robbins</u>, 519 U.S. 452 (1997)).  Deference,
however, is proper only if the agency's interpretation is
reasonable.  "[A]n agency's interpretation of its own regulations
must be given effect 'so long as the interpretation sensibly
conforms to the purpose and wording of the regulations.'" <u>Southern</u>
<u>Cal. Edison Co. v. United States</u>, 226 F.3d 1349, 1356 (Fed. Cir.
2000) (quoting <u>Martin v. Occupational Safety and Health Review</u>

Comm'n, 499 U.S. 144, 150 (1991)).   The Court's deference is

particularly appropriate when

> the agency is applying its regulations to a complex or
> changing circumstance, thus requiring the agency to bring
> to bear its unique expertise and policy-making
> prerogatives. When . . . judicial deference is [proper],
> a court must accept the agency's reasonable
> interpretation of a regulation, even if there may be
> other reasonable interpretations to which the regulation
> is susceptible, and even if the court would have
> preferred an alternative interpretation.

Id. at 1357 (internal citations omitted).


**DISCUSSION**

**I.   Proper and Sufficient Notice**

**A. Background**

This case concerns Commerce's procedure for conducting an

administrative review and imposing antidumping duties.   The

procedure involves four steps: (1) Commerce publishes a notice of

Opportunity to Request an Administrative Review for the POR at

issue; (2) upon receipt of such request, Commerce publishes a

notice of Initiation of an Administrative Review in the Federal

Register; (3) Commerce, in order to obtain pertinent information,

distributes or makes available questionnaires to those entities

Commerce designated in the notice of Initiation; and (4) on the

basis of the information gathered, Commerce determines the antidumping duty rates applicable to each entry or type of entries and publishes these determinations in the Federal Register. See generally, 19 U.S.C. § 1675(a); 19 C.F.R. §§ 353.22, 353.31, 355.31 (1994).

On June 7, 1994, in accordance with 19 C.F.R. § 353.22, Commerce published a notice of Opportunity to Request an Administrative Review for the 1993-94 POR of TRBs from the PRC. See Opportunity to Request Administrative Review of Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation, 59 Fed. Reg. 29,411. In response, on June 30, 1994, The Timken Company ("Timken") requested a review of one hundred and one companies known to Timken to be sources of TRBs and, in addition, requested a review of "all merchandise covered by the order, from whatever source." See Def.'s Mem. Opp'n Pl.'s Mot. J. Agency R. ("Def.'s Mem.") at 4 (citing to P.D. 1, Fi. 1, Fr. 1, 3-12). The list of one hundred and one companies did not include Goldhill International Trading & Services Co. and Direct Source International (collectively "Transcom's Hong Kong exporters"), entities that were Hong Kong nationals exporting TRBs from the PRC for Transcom, a United States importer. See id. at 8.

On July 26, 1994, Commerce informed the PRC government and the PRC Ministry of Foreign Trade and Economic Cooperation ("MOFTEC") about the impending administrative review and requested information concerning "'all companies, including third-party exporters, that . . . exported' TRBs from the PRC." Id. at 5 (citing to P.D. 4, Fi. 1, Fr. 34) (emphasis supplied); see also Preliminary Results, 60 Fed. Reg. at 49,572.

On August 24, 1994, Commerce initiated the review at issue, naming in the notice of Initiation the one hundred and one companies identified by Timken, thus omitting Transcom's Hong Kong exporters. See Initiation of Antidumping Duty Administrative Reviews and Requests for Revocation in Part ("Notice of Initiation"), 59 Fed. Reg. 43,537. The Notice of Initiation also provided that "[a]ll other exporters of tapered roller bearings are conditionally covered by this review." Id. at 43,539.

On December 5, 1994, Commerce sent a copy of the Notice of Initiation and the questionnaires to the PRC's Secretary General of the Basic Machinery Division of the Chamber of Commerce for Import and Export of Machinery and Electronics ("Machinery Division"), the contact entity suggested by MOFTEC. See Def.'s Mem. at 5 (citing

to P.D. 4, Fi. 1, Fr. 34). Commerce directed the Machinery Division to send the questionnaires to all companies named in the list and indicated that the information sought in the questionnaires may be required from exporters not specifically listed in the Notice of Initiation.[2] See Def.'s Mem. at 6 (citing to P.D. 17, Fi. 2, Fr. 31).

On September 26, 1995, after the time period to answer the questionnaires had expired, Commerce published the results of its preliminary review. See Preliminary Results, 60 Fed. Reg. 49,572. Subsequently, Transcom appeared and identified its Hong Kong exporters as resellers of TRBs from the PRC. See Def.'s Mem. at 8. On February 11, 1997, Commerce published the Final Results, and the determinations made therein unfavorably affected Transcom's entries from its Hong Kong exporters. See 62 Fed. Reg. at 6189, 6211-13.

---

[2] Commerce informed the Machinery Division that Commerce would, in addition, personally present the questionnaires to the members of the Machinery Division. See Def.'s Mem. at 6-7 (citing to P.D. 16, Fi. 2, Frs. 25-30). The presentation took place in Beijing on December 7-9, 1994, and was attended by ten out of one hundred and one respondents named on the Notice of Initiation and one voluntary respondent, Xiangfan International Trade Corp., that was not named in the list. See Preliminary Results, 60 Fed. Reg. at 49,572.

B.    Contentions of the Parties

Transcom contends that under 19 U.S.C. § 1675(a) and 19 C.F.R. § 353.22 Commerce lacked authority to review and impose the resulting determinations upon entries of any company other than those identified by name in the Notice of Initiation.  See Pl.'s Br. Supp. Mot. J. Agency R.("Pl.'s Br.") at 13-16; Pl.'s Reply Br. Supp. Mot. J. Agency R. ("Pl.'s Reply Br.") at 4, 6.  Transcom argues that the statutory and regulatory language requires Commerce to provide exporters and their United States importers with individual notice in order to properly subject the entries in which these parties may have an interest to Commerce's review determinations.  See Pl.'s Br. at 15-16.

Transcom further points out that Commerce had a practice of personally identifying each exporter subject to review by name. See id. at 18.  In addition, Transcom asserts that its Hong Kong exporters were automatically entitled to receive individual notices because they were nationals of a market economy.  See id. at 21-23, 32.  Transcom concludes that the language Commerce used in its Notice of Initiation failed to provide Transcom and its Hong Kong exporters with adequate notice that their interests may be affected.  See id. at 3-4, 32.

Commerce argues that it: (1) was obligated to provide notice only to "respondents" determinable under the "first to know test," here, the PRC suppliers to Transcom's Hong Kong exporters; (2) could not have provided better notice because it had "no independent source of information on Chinese TRB exporters superior to the industry information possessed by Timken"; and (3) provided the maximum amount of notice available to the trade community by (a) issuing a statement in the Federal Register that "[a]ll other exporters of tapered roller bearings are conditionally covered by this review"; (b) contacting the PRC government with an implicit request to identify third-country exporters; and (c) traveling to Beijing to present the questionnaires to the members of the Machinery Division.  Def.'s Mem. at 15-17, 43-45.

Timken agrees with Commerce's contention that the language "[a]ll other exporters of tapered roller bearings are conditionally covered by this review" included in the Notice of Initiation provided Transcom and its Hong Kong exporters with adequate notice that Transcom's entries were subject to the review.  See Timken's Resp. Opp'n Pl.'s Mot. J. Agency R. ("Timken's Resp.") at 9-12.  Timken also points out that neither the statute nor the regulation requires Commerce to limit an administrative review to specifically

identified exporters only.  <u>See</u> Timken's Resp. at 14-19 (citing to 19 U.S.C. §§ 1675(a), 1677e(b); 19 C.F.R. § 353.22(a),(c)).

### C.    Analysis

The  Court's  analysis  begins  with  an  examination  of  the relevant  statutory  and  regulatory  provisions.   The  applicable statute does not expressly designate the parties to whom notice is due.   Section  1675(a)(1)  only  provides  that  a  review  can  be conducted "after  publication  of  notice  of  such  review  in  the Federal Register . . . ."  19 U.S.C. § 1675(a)(1).

Because  the  language  of  the  statute  does  not  address  the issue, the Court turns to the legislative history of § 1675(a)(1) to determine whether Congress has "directly addressed the precise question at issue."  <u>Chevron</u>, 467 U.S. at 843; <u>see</u> <u>Suramerica de Aleaciones Laminadas, C.A. v. United States</u>, 966 F.2d 660, 667 (Fed.  Cir.  1992).   The  extensive  legislative  history  of  § 1675(a)(1), however, does not indicate that Congress addressed the issue of individual notice.  <u>See generally</u>, Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418 (codified as 19 U.S.C. § 2901 (1994)); Trade and Tariff Act of 1984, Pub. L. No. 98-573 (codified as 19 U.S.C. § 1675); Trade Agreements Act of

1979, Pub. L. No. 96-39 (codified as 19 U.S.C. § 2501 (1994)).

In situations where Congress has not provided clear guidance on an issue, Chevron requires the Court to defer to Commerce's interpretation of 19 U.S.C. § 1675(a)(1) so long as this interpretation is reasonable.  See Chevron, 467 U.S. at 845; Koyo Seiko Co., 36 F.3d at 1570.  This Court, therefore, turns to the language of a regulation implemented under the statutory mandate of 19 U.S.C. § 1675(a)(1).

The regulation provides only that the notice of "Initiation of Antidumping Duty Administrative Review" must be published in the Federal Register "[a]fter receipt of a timely request . . . or on [Commerce's] own initiative when appropriate . . . ."  19 C.F.R. § 353.22(c)(1).  An accompanying regulation mandates that a notice of initiation must include the following: "[a] description of the merchandise . . .; [t]he name of the home market country . . . ; and [a] summary of the available information that would, if accurate, support the imposition of antidumping duties."  19 C.F.R. 353.11(a)(2) (1994).

Both regulations, 19 C.F.R. § 353.22(c)(1) and 19 C.F.R. 353.11(a)(2), are reasonable implementations of 19 U.S.C. §

1675(a)(1) and warrant this Court's deference.  See Chevron, 467
U.S. at 845; Koyo Seiko Co., 36 F.3d at 1570.  In fact, the
language of 19 C.F.R. § 353.22(c)(1) is greatly similar to that of
19 U.S.C. § 1675(a)(1) and 19 C.F.R. § 353.11(a)(2) is a typical
notice provision,[3] a legitimate mechanism effectuating the
statutory mandate.  See 19 U.S.C. § 1675(a)(1), 19 C.F.R. §§
353.11(a)(2), 353.22(c)(1).

Neither regulation, however, states whether Commerce itself
must identify an exporter by name in the notice of initiation of
review in order to make the entries of merchandise obtained from
this exporter subject to the results of the review.  Thus, this
Court needs to examine whether the language of these regulations
was reasonably interpreted and applied by Commerce in the instant
case.  See Southern Cal. Edison Co., 226 F.3d at 1356.  The two
issues arising from the contentions set forth above are: (1) to
whom is the notice due; and (2) whether the particular language
employed by Commerce constituted adequate notice.

---

[3] The regulation makes a typical requirement to describe and
designate the location of the subject matter of the review and
provide an aggrieved party with an opportunity to offer contrary
evidence.  See 19 C.F.R. § 353.11(a)(2); cf. DAVID D. SIEGEL, NEW YORK
PRACTICE 82 (3d ed. 1999) (noting that "[c]ase law suggests . . .
that not much is needed to qualify . . . as notice").

### 1.   Parties to Whom Notice Is Due

The lack of express statutory or regulatory guidelines regarding who is a proper respondent for the purpose of notice prompts creative interpretations by both Transcom and Commerce.

Commerce initially states that if an antidumping duty order covers a product from a nonmarket economy ("NME"), like the PRC, "<u>all</u> exporters of the subject merchandise <u>and</u> the PRC government are the proper respondents" for the purpose of receiving notice. Def.'s Mem. at 17 (emphasis supplied). From this simple and clear statement, Commerce leaps to the "first to know" test which it presents as "a solid analytical construct for determining whether the NME supplier or a third-country reseller is the proper respondent." <u>Id.</u> The "first to know" test, as Commerce explains, is a step in the antidumping duty computation. <u>Id.</u> at 17-18 (citing to <u>Ferrovanadium and Nitrided Vanadium From the Russian Federation</u>, 60 Fed. Reg. 27,957 (May 26, 1995); <u>Fuel Ethanol From Brazil</u>, 51 Fed. Reg. 5572 (Feb. 14, 1986); and <u>Certain Stainless Steel Sheet and Strip Products From the Federal Republic of</u>

Germany, 48 Fed. Reg. 20,459 (May 6, 1983)).[4]  Commerce's logic

escapes this Court.  Commerce does not adequately explain how the

calculation of an antidumping duty rate, that is, the amount of

money to be paid by an importer for an entry of merchandise that

could pass through the hands of many resellers, including NME as

well as market economy resellers, could reveal the identity of the

proper producer or reseller Commerce ought to notify.

Disregarding this incongruity, Commerce concludes that only

where "evidence indicates that a reseller . . . directs the sale of

the subject merchandise to the United States, Commerce [regards]

that reseller . . . as the proper respondent" for the purpose of

receiving notice.  Def.'s Mem. at 17.  Taking this proposition to

its logical conclusion, Commerce would need to receive evidence

from a reseller or a third party that the reseller is the "proper

_____

[4] The test turns on which entity in the chain of exportation
has "the knowledge that the merchandise [is] destined for the
United States."  Def.'s Mem. at 18.  The answer is determined for
the purpose of assessment of less than fair value ("LTFV").  Id.
Each of the decisions cited by Commerce, accordingly, addresses the
issue of LTFV assessment, the computation formula.  Computation of
LTFV sales involves three steps: (1) calculation of the U.S. market
price; (2) calculation of the foreign market value; and (3)
calculation of the difference between these two amounts.  See
generally, 19 U.S.C. §§ 1677, 1677b (1994); 19 C.F.R. §§ 353.41,
353.46 (1994).

respondent" in order to notify that very reseller. Obviously, the proposition of getting evidence from a reseller in order to notify this reseller about its obligation to supply the very evidence on the basis of which the reseller has to be notified is circular. The alternative scenario of getting evidence from a third party in order to notify a reseller who is the "proper respondent" suggests a fatuous regime where, in NME cases,[5] the following would occur: (1) Commerce would be allowed to notify an "improper" entity in the chain of exportation with a hope that this notified improper entity, although not threatened with any potential loss because of its "improper" status, would somehow readily possess all the necessary and correct evidence; (2) this improper entity would take pains to submit this evidence and notify Commerce to issue another notice to the "proper" entity; (3) this "proper" entity would meaningfully respond; and (4) this whole chain of events would happen within the limited time allocated under the regulations.[6]

---

[5] Neither party contests that "[i]f the administrative review[] ha[s] been for products from a market economy country, the scope of the review[] would have been limited to those exporters named in the notices of initiation." Transcom, Inc. v. United States, 182 F.3d 876, 881 (Fed. Cir. 1999).

[6] Commerce must receive all responses from the "proper" respondents within the maximum of 180 days. See 19 C.F.R. § 353.31(a)(1)(ii).

Clearly, the Court cannot embrace the interpretation proposed by Commerce. The regime Commerce contemplated would run afoul of the statutory mandate of 19 U.S.C. § 1675(a)(1) and the logic behind regulatory language of 19 C.F.R. § 353.22(c). It would also violate the reasonableness tests posed by <u>Southern Cal. Edison Co.</u> and the second prong of <u>Chevron</u>. See <u>Chevron</u>, 467 U.S. at 845; <u>Auer v. Robbins</u>, 519 U.S. 461; <u>Southern Cal. Edison Co.</u>, 226 F.3d at 1356.

Transcom's reading of the regulatory language is equally unpersuasive. Specifically, Transcom relies on 19 C.F.R. § 353.22(a) which provides that "an interested party . . . may request in writing . . . [an] <u>administrative review of specified individual producers or resellers covered by an order</u> . . . ." Pl.'s Br. at 13 (emphasis in the brief). Transcom concludes that this language obligates Commerce to identify every producer or reseller by name. <u>Id.</u> at 13-14. Transcom misreads the regulation. Section 353.22(a) applies to the request for review of the "interested party" (here, Timken[7]); it does not provide that

---

[7] Indeed Commerce's attempt to explain the lack of notice to Transcom's Hong Kong exporters by quoting Timken's request for a review of "all merchandise covered by the order, from whatever

(continued...)

Commerce must similarly specify the names of individual resellers in its Notice of Initiation in order for the resulting administrative review to cover entries of merchandise purchased from these resellers. See generally, 19 C.F.R. § 353.22(a).

In support of its proposition Transcom cites Federal-Mogul Corp. v. United States, 17 CIT 442, 822 F. Supp. 782 (1993) and 19 C.F.R. § 353.22(c). See Pl.'s Br. at 13-14, 16. These authorities, however, do not support Transcom's assertion. Federal-Mogul addresses a different issue, the assessment of companies never reviewed; the case does not examine the situation where companies are reviewed under a notice of questionable adequacy. See generally, 17 CIT 442, 822 F. Supp. 782. Section

---

[7](...continued)
source," in addition to those entities Timken specifically identified, cannot succeed. Def.'s Mem. at 3, 43-44. The generalized language in Timken's request clearly contradicts the requirement for "specified individual" identification posed by 19 C.F.R. § 353.22(a). As Transcom correctly points out, "Commerce has no obligation to do a domestic industry's homework in identifying specified foreign producers and resellers in a review request." Pl.'s Reply Br. at 8 (citing to Floral Trade Council v. United States, 17 CIT 1417 (1993)). The shortcomings of Timken's request are, however, irrelevant to the issue of Commerce's Notice of Initiation and Transcom is not warranted in its effort to interpret the language of Floral Council as placing the burden on Commerce to identify those exporters the domestic industry failed to name.

353.22(c) similarly does not lend support to Transcom's contention. The regulation merely provides that Commerce must send questionnaires to appropriate interested parties. See 19 C.F.R. § 353.22(c)(2). Nowhere does the regulation define "appropriate" parties as producers or resellers that are individually named. See generally, 19 C.F.R. § 353.22.

Finally, Transcom claims that Commerce "could have identified all other suppliers of TRBs from the PRC and named them in the Notice of Initiation . . . ." in order to better fulfill the requirement of 19 C.F.R. § 353.22. Pl.'s Br. at 15 (emphasis supplied); see Pl.'s Reply Br. at 9. Transcom ignores the fact that Commerce had no independent source of information on Chinese TRB exporters superior to the industry information possessed by Timken. See Def.'s Mem. at 15-17, 43-35. Transcom similarly ignores Commerce's contacts with MOFTEC and the Machinery Division and Commerce's distribution of questionnaires in Beijing, all of which constituted an adequate bona fide effort on the part of Commerce to identify other exporters of TRBs from the PRC. See id. at 5.

While realizing the enormous importance of adequate notice,

the Court refuses to embrace the onerous regulatory regime suggested by Transcom. Under Transcom's interpretation, Commerce would be forced to go through every invoice involved in the chain of distribution of every piece of merchandise that enters the United States in an effort to identify and personally name each producer as well as each intermediate reseller prior to issuing a notice of initiation. The notice requirement must be balanced against practical considerations. "[T]he reasonableness of the notice provided must be tested with reference to the existence of 'feasible and customary' alternatives and supplements to the form of notice chosen." Greene v. Lindsey, 456 U.S. 444, 454 (1982) (citations omitted).

Commerce is not "required to give personal notice to [each and every] party that could be affected by an administrative review" and is "free to choose a variety of means to give reasonable notice . . . [as long as Commerce] provide[s] some form of notice that the administrative review may result in an increase in the importer's liability . . . ." Transcom, Inc. v. United States ("Transcom CAFC"), 182 F.3d 876, 882, 884 (Fed. Cir. 1999) (emphasis supplied).

The Court concludes that while it was Commerce's basic responsibility to provide adequate notice to all parties that could potentially be affected by the review, Commerce was not obligated to list these parties by name in order to satisfy the notice requirements posed by 19 U.S.C. § 1675(a)(1) and 19 C.F.R. § 353.22(c).

### 2. Adequacy of the Language Employed

Having established that Commerce was not under an obligation to provide individual notice, the Court now turns to the question whether the particular language Commerce chose to employ in the Notice of Initiation provided Transcom and its Hong Kong exporters with adequate notice.

In addition to listing the one hundred and one companies subject to the review, the Notice of Initiation provided that "[a]ll other exporters of tapered roller bearings are conditionally covered by this review." Notice of Initiation, 59 Fed. Reg. at 43,539. Transcom contends that this language was inadequate to provide proper notice because Commerce was required to identify Transcom's Hong Kong exporters, nationals of a market economy, by name in the Notice of Initiation. See Pl.'s Br. at 21-23. This is

incorrect.

Neither the statute nor the regulation actually requires the review to cover only the companies "specifically" listed in the Notice of Initiation. See generally, 19 U.S.C. § 1675(a); 19 C.F.R. § 353.22. Commerce's practice only dictates that "the administrative reviews . . . for products from a market economy country . . . [are] limited to those exporters [specifically] named in the notices of initiation. . . . [T]he case is different [however, and the rule does not apply to products from] nonmarket economy countries such as the People's Republic of China." Transcom CAFC, 182 F.3d at 881 (emphasis supplied).

Transcom failed to distinguish between the country of nationality of its exporters and the country of origin of its imported product. In the case at hand, the merchandise at issue was a product of the PRC, a nonmarket economy. Commerce's practice with regard to market economy products––the practice of limiting the scope of administrative reviews to the exporters identified by name in the Notice of Initiation--was, therefore, inapplicable.

Alternatively, Transcom alleges that Commerce's statement that "[a]ll other exporters of tapered roller bearings are conditionally

covered by this review" was "actively misleading" because it failed to indicate that the exporters that were not personally identified in the Notice of Initiation could nevertheless be subject to the review, and the statement did "not fulfill the notice requirement contained in the regulations." Pl.'s Br. at 3, 15, 19. The Court disagrees. "What the statutory and regulatory notification provisions require is that any reasonably informed party should be able to determine, from the published notice of initiation read in light of announced . . . policy, whether particular entries in which it has an interest may be affected by the administrative review." Transcom CAFC, 182 F.3d at 882-83 (emphasis supplied).

Transcom maintains that it was unaware of Commerce's new policy of including the entities identified by an all-encompassing definition into the scope of Commerce's review. See Pl.'s Br. at 13. Transcom alleges that, in view of Commerce's prior practice of personally identifying all covered exporters in its notices of initiation, Transcom could not have been aware of Commerce's new policy.[8] See Pl.'s Reply Br. at 10-13.

_____

    [8] Transcom successfully challenged the antidumping duties assessed against Transcom by Commerce at the conclusion of the fourth, fifth and sixth administrative reviews (covering the period

(continued...)

Transcom's position is without merit.  As a prominent member

of the industry, Transcom was aware and was expected to make itself

aware of publications in the Federal Register.  See, e.g., id. at

11 (meticulously observing that an indication of Commerce's new

policy appeared in a document filed on March 25, 1995, but was

reflected in the Federal Register only on February 27, 1996).

After reading the Notice of Initiation in the  Federal Register and

encountering the unfamiliar statement that "[a]ll other exporters

of tapered roller bearings are conditionally covered by this

review," Transcom, a seasoned importer of the merchandise at issue

---

    [8](...continued)
from 1990-93).  See Transcom CAFC, 182 F.3d 877.  The challenge was
based on Commerce's failure to include the names of Transcom's
exporters in the list of entities specifically identified in
Commerce's notices of initiation of those reviews and Commerce's
attempt to subject the entries from these unnamed exporters to
upward assessment of duties.  See id. at 877-78. The preliminary
determinations of the fourth, fifth and sixth administrative
reviews were published on August 25, 1995, and they stated that
"for other non-PRC exporters of subject merchandise from the PRC,
the cash deposit rate will be the rate applicable to the PRC
supplier of that exporter," causing Transcom to appear and object.
Preliminary Results of Antidumping Administrative Reviews  on
Tapered Roller Bearings and Parts Thereof, Finished and Unfinished,
From the People's Republic of China, 60 Fed. Reg. 44,302; see
Transcom CAFC, 182 F.3d at 878.  Timken argues that this statement
put Transcom on notice that its Hong Kong exporters would be
subject to the review.  See Timken's Resp. at 7-8.  This court is
unconvinced.  The statement put Transcom on notice of possible
applicable rates but was irrelevant to the issue of the scope of
Commerce's review.

from the particular country at issue, should have been aware that the usual language of notices of initiation had changed. The newly-included language, the very fact of the change, put Transcom on notice that Commerce's policy could have changed and provided Transcom with the information necessary to extrapolate the fact that the "particular entries in which it has an interest <u>may</u> be affected by the administrative review." <u>Transcom CAFC</u>, 182 F.3d at 882-83 (emphasis supplied).

Moreover, as Timken correctly points out, the Court of Appeals for the Federal Circuit ("CAFC") already indicated that the very language employed by Commerce would constitute sufficient notice. The CAFC observed that

> [if] Commerce [states] . . . in the notice[] of initiation of administrative review[] of the tapered roller bearing antidumping order that <u>all unnamed exporters of tapered roller bearings from the People's Republic of China are conditionally covered by the review</u> . . . [, this statement] would constitute sufficient notice of the administrative review to the unnamed exporters, and thus sufficient notice to the importer of those exporters' goods [and] . . . satisfy the statutory and regulatory notification requirements. . . . [S]uch statement [would] <u>go far beyond any notice</u>, constructive or otherwise, given to the unnamed exporters (and, by

extension, to Transcom) in this case.[9]

Id. at 882 (emphasis supplied).


This Court agrees.  The statement that "[a]ll other exporters of tapered roller bearings are conditionally covered by this review" gave Transcom, a seasoned importer, more than sufficient constructive notice[10] that the particular entries in which Transcom had an interest could possibly be affected by the administrative review.


Transcom and its exporters could have made an inquiry to

---

[9] Transcom alleges that Commerce's actions, in addition to being injurious to Transcom, were "fundamentally prejudicial to [Transcom's] exporters" and "penalized these companies . . . [in a way] inherently unfair, and grossly incompatible with the statute." Pl.'s Br. at 3-4, 31.  Transcom's Hong Kong exporters, however, are not parties to this action and this Court shall not entertain any claims on their behalf.

[10] Constructive notice is

> information or knowledge of a fact imputed by law to a person . . . because he could have discovered the fact by proper diligence, and his situation was such as to cast upon him the duty of inquiring into it.  Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact.
>         Constructive "notice" includes . . . inquiry notice.

BLACK'S LAW DICTIONARY 1062 (6th ed. 1990).

Commerce.  They could have alerted their PRC producers or prompted them to attend the distribution of questionnaires in Beijing. Transcom's exporters could have obtained a questionnaire themselves and submitted it to Commerce, just like Xiangfan International Trade Corporation did.  See Preliminary Results, 60 Fed. Reg. at 49,572-73.  Yet Transcom and its Hong Kong exporters did none of the above, choosing instead to complacently wonder what the term "conditionally covered" means.  See Pl.'s Br. at 18.  Had Transcom been in doubt about the meaning of the term, it was but a phone call away from the answer.

Transcom and its exporters' refusal to act upon Commerce's notice cannot constitute evidence of unreasonableness of this notice.  In view of the rapidly-changing world of global trade and Commerce's limited resources, Commerce should be able to rely on its "unique expertise and policy-making prerogatives" by designating parties subject to the review with a collective term. See Southern Cal. Edison Co., 226 F.3d at 1357; Def.'s Mem. at 43 (attesting to Commerce's inability to obtain personal information about all potential exporters).  Because Commerce's use of the statement that "[a]ll other exporters of tapered roller bearings are conditionally covered by this review" was a valid application

of notice requirement contained in the regulation to a complex or changing circumstance, it should not be disturbed.  See Southern Cal. Edison Co., 226 F.3d at 1357.

This Court concludes that the collective, all-encompassing language "[a]ll other exporters of tapered roller bearings are conditionally covered by this review" satisfied the requirements posed by the statutory mandate of 19 U.S.C. § 1675(a)(1) and the regulatory language of 19 C.F.R. § 353.22(c).

## II.  Application of Uncooperative BIA

### A.    Background

On September 26, 1995, Commerce published the results of its preliminary review.  See Preliminary Results, 60 Fed. Reg. 49,572. In Preliminary Results, Commerce determined a separate antidumping duty rate for each of the companies that had responded to the questionnaires.  See id. at 49,573-74.  In addition, Commerce stated its intention to apply the "best information available" ("BIA") rate to "those companies for which [Commerce] initiated a review and which did not respond to the questionnaires."  Id. at 49,575.

In its final determination, Commerce assigned the "uncooperative BIA" rate of 25.56 percent (equal to the PRC rate) to all the entries from the PRC exporters that failed to respond to the questionnaires supplied by Commerce and, therefore, were deemed not entitled to a separate rate because of their inability to establish their independence from the PRC. See Final Results, 62 Fed. Reg. at 6208. In addition, Commerce assigned the "cooperative BIA" rate of 25.56 percent (equal to the "uncooperative BIA" rate) to all the entries by those exporters who failed to establish their independence from the PRC by submitting responses containing "deficiencies[,] . . . lack[ing in] supplier data and includ[ing] significant errors . . . ." See id. at 6210, 6214. Finally, Commerce stated that for entries from the "other non-PRC exporters of subject merchandise from the PRC [, that is, the exporters covered by the review that were neither supplied with the questionnaires nor participated on their own], the . . . rate will be the rate applicable to the PRC supplier of that exporter." Id. at 6214.

### B. Contentions of the Parties

Transcom contends that because neither its Hong Kong exporters

nor their PRC suppliers were given notice, Commerce was precluded from subjecting Transcom's entries to the "punitive"(meaning "uncooperative") BIA rate reserved for those entities that were supplied with the questionnaires but neglected to respond.  See Pl.'s Br. at 27-28.  In addition, Transcom argues that the entries from its Hong Kong exports should not be subject to the BIA rate because: (1) the usage of BIA ensues from the concept of "state-controlled enterprise";[11] and (2) Transcom's Hong Kong exporters, nationals of a market economy, are inherently not subject to the PRC government's control.  See id. at 21-23.

Commerce maintains that it acted in accordance with its practice by initially presuming that, in an NME case, all producers and exporters are part of a single state-controlled enterprise.

_____

[11] Under the "state-controlled enterprise" concept, companies subject to the review are required to show their independence from the state-controlled enterprise in order to receive a separate antidumping duty rate.  See Transcom CAFC, 182 F.3d at 878-79.  If all companies covered by the review succeed in proving their independence from the state-controlled enterprise, each of these companies is accorded a separate treatment, and the state-controlled enterprise is consequently deemed excluded from the review.  Id.  Conversely, if some companies included in the review fail to establish their independence, Commerce concludes that the state-controlled enterprise is covered by the review, and those companies that fail to prove their independence receive a single rate of the state-controlled enterprise.  Id.

See Final Results, 62 Fed Reg. at 6212.  If the state-controlled enterprise fails to cooperate, Commerce establishes the rate applicable to companies deemed to be part of the state-controlled enterprise, in the instant case, the PRC rate, using uncooperative BIA.  See id.  Commerce points out that "the Act mandates application of BIA for such companies because they were properly included in the review and [through the inaction of the state-controlled enterprise] did not respond to [Commerce's] request for information."  Id.

Commerce further asserts that the exporters notified without individual identification were obliged to demonstrate their independence from the state-controlled enterprise in the very same fashion as the exporters individually named in the Notice of Initiation or would risk being considered a part of the state-controlled enterprise, that is, deemed ineligible for separate treatment and assigned that enterprise's single rate.  See Def.'s Mem. at 27.

Timken argues that Commerce was entitled to resort to BIA in determining the rate for exporters not individually named in the Notice of Initiation because Commerce contacted the PRC government,

provided it with the questionnaires and directed it to transmit the questionnaires to all companies in the PRC that produced TRBs for export to the United States.  See Timken's Resp. at 19-20.


### C.   Analysis

Transcom and Timken conflate the threshold procedural issue of notice sufficiency with the entirely distinct issue of Commerce's right to rely on BIA in its calculation of actual dumping duties. See generally, Pl.'s Br. at 23-33, 27-28; Pl.'s Reply Br. at 19-20; Timken's Resp. at 19-20.  Having established that the notice given by Commerce was sufficient, this Court now turns to the remaining issues: (a) Commerce's use of uncooperative BIA in calculating the antidumping duty rate; and (b) Commerce's application of BIA to the merchandise produced in an NME country but imported into the United States through a market economy exporter.

Actual dumping duties are calculated by Commerce after an administrative review.  See 19 U.S.C. § 1675(a).  In such a review, Commerce provides a questionnaire to the foreign producer in order to solicit sales information for United States sales and home-market sales for the particular POR covered and, on the basis of

this information, calculates the actual dumping duty.[12] When Commerce cannot obtain the information in a timely manner or receives incomplete information, the statute and regulation allow and, in certain circumstances, require Commerce to use BIA. See 19 U.S.C. § 1677e(b); 19 C.F.R. § 355.37(a).

### 1. Commerce's Resort to Uncooperative BIA

The relevant statutory provision dictates that if Commerce "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from . . . [Commerce], . . . [Commerce] may use . . . the facts otherwise available." 19 U.S.C. § 1677e(b); accord 19 U.S.C. § 1677e(c) (1988) (stating that "[i]n making [antidumping duty] determinations . . . [Commerce] shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise

---

[12] To the extent that this actual dumping duty differs from the estimated duty deposit collected pursuant to the previously issued antidumping duty order, the difference is refunded or charged to the importer. See 19 U.S.C. § 1673f (1994). "Dumping duties are not penal in nature, but are 'additional duties' to equalize competitive conditions between the exporter and [affected U.S. industries]." Imbert Imports, Inc. v. United States, 67 Cust. Ct. 569, 576 n.10, 331 F. Supp. 1400, 1406 n.10 (1971), aff'd, 60 CCPA 123, 475 F.2d 1189 (1973).

significantly impedes an investigation, use the best information otherwise available").

The statutory language is clear and unambiguous. A statute's text is Congress's final expression of its intent, and if the text answers the question, that is the end of the matter. See Timex V.I., Inc., 157 F.3d at 882 (citing Chevron, 467 U.S. at 843 n.9). Commerce's regulation must completely conform to the statutory language. See id.

The regulation implemented under the statute provides that Commerce is entitled to resort to BIA if Commerce "(1) [d]oes not receive a complete, accurate, and timely response to [its] request for factual information; or (2) [i]s unable to verify, within the time specified, the accuracy and completeness of the factual information submitted." 19 C.F.R. § 355.37(a) (1994). The language of § 355.37(a) is a practical implementation of the statutory mandate, a mechanism to prevent the impediments to investigation proscribed by the statute. See 19 U.S.C. § 1677e(b). The regulation conforms to the clear and unambiguous statutory language, thus satisfying the first prong of the Chevron test. See Chevron, 467 U.S. at 842-43.

Transcom's protest to Commerce's use of BIA is unfounded. Commerce did exactly as the statute, regulation and its own announced policy mandated when it requested but procured no information from parties "conditionally covered," such as Transcom's Hong Kong exporters and their PRC suppliers.[13] The statute required Commerce to enter a determination with regard to the entries by companies covered by the review. See 19 U.S.C. 1675b(b)(1)(B) (1994). Commerce had no other statutorily permissible or practically feasible way to calculate the rate (except on the basis of BIA) if the interested parties did not produce information requested. See 19 U.S.C. § 1677e(b). Thus, Commerce acted fully in accordance with the controlling provisions.

Transcom's expectations are beside the point. "[T]he

---

[13] Transcom contends that the PRC suppliers of its Hong Kong exporters were not notified. See Pl.'s Br. at 27-28. This Court is unconvinced. Commerce's efforts were more than diligent: it notified MOFTEC and the Machinery Division, requested that the questionnaires be transmitted to all companies in the PRC that produced tapered roller bearings for export during the POR at issue and even went to Beijing to personally distribute the questionnaires. The Court agrees with Timken's observation that "[i]f Transcom's suppliers never received a copy of that questionnaire, the problem lies with the state under whose control they operate, not with [Commerce]. By analogy, a single factory could not avoid service by asserting that only the corporate headquarters was served." Timken's Resp. at 20.

expectations of the U.S. importer are irrelevant in setting a dumping margin.  When a United States importer deals with a foreign company that is subject to an antidumping duty order, the importer must realize that the dumping margin could change to its benefit or detriment" after the actual dumping duty is calculated by Commerce on the basis of information Commerce receives.  Union Camp Corp. v. United States, 22 CIT ___, ___ n.7, 8 F. Supp. 2d 842, 852 n.7 (1998).

Transcom asserts that Commerce abused its discretion when  it applied the "punitive" uncooperative BIA rate (equal to the PRC rate) to the entries from Transcom's Hong Kong exporters,[14] that is, companies obviously not subject to the PRC control, because the same BIA rate was assigned to the companies that were subject to

---

[14] Commerce established an "uncooperative" BIA rate equal to the "cooperative" one.   Final Results, 62 Fed. Reg. at 6214.   It shall be noted that "[i]f an interested party refuses to provide factual information requested, . . . [Commerce] may take that into account in determining what is the best information available" and may assign an uncooperative BIA rate for the entries of such party different from "cooperative" BIA rates accorded to the parties that participated in the review but provided insufficient information. 19 C.F.R. § 355.37(b); see Final Results, 62 Fed. Reg. at 6208-10. Thus, Commerce could, but did not, assign a less favorable BIA rate to "uncooperative" parties.   In view of the fact that the "uncooperative" BIA rate was equal to the "cooperative" one, it is unclear how Transcom concluded that it was assigned one and not the other.

the PRC control or failed to prove their independence from the PRC. See Pl.'s Br. at 21-22, 26-28.

Transcom misses the point in questioning Commerce's political and geographical aptitude and distorts the statement Commerce made in the Final Results. Commerce's use of uncooperative BIA does not necessarily make the resulting rate "punitive" in nature or classify the exporter as an entity subject to the PRC control. See generally, Final Results, 62 Fed. Reg. 6189.

"In order for the agency's application of the best information rule to be properly characterized as 'punitive,' the agency would have had to reject low margin information in favor of high margin information that was demonstrably less probative of current conditions." Allied-Signal Aerospace Co. v. United States, 996 F.2d 1185, 1191 (Fed. Cir. 1993) (citation omitted).

In the instant case, Commerce had no "low margin" information "demonstrably [more] probative of current conditions" to reject. Rather, the determinations Commerce made were deductive in nature. First, Commerce has determined that "for [entries purchased from] other non-PRC exporters of subject merchandise from the PRC [like Transcom's Hong Kong exporters], the cash deposit rate [would] be

the one applicable to the PRC supplier[s] of that exporter." Final Results, 62 Fed. Reg. at 6212 (emphasis supplied). Second, Commerce determined that if such suppliers were "companies in the government-controlled enterprise [that] failed to respond to [Commerce's] requests for information," they, accordingly, were subject to the rate determined by using uncooperative BIA." Id. Thus, the BIA rate applicable to Transcom's entries was derived from the PRC rate assigned to the PRC suppliers of Transcom's Hong Kong exporters and was not directly related to the national status of Transcom's Hong Kong exporters. See Final Results, 62 Fed. Reg. at 6212-14.

Commerce's deductive determination was entirely justified. Transcom must bear responsibility for the failure of its sources to provide the necessary information. As Commerce correctly points out, "when resellers choose to use uncooperative suppliers that are under a dumping order," they must bear the consequences. Def.'s Mem. at 20-21 (citing Yue Pak, Ltd. v. U.S. Int'l Trade Admin., 20 CIT 495, 504(1996), aff'd, 111 F.3d 142 (Fed. Cir. 1997)).

The Court concludes that Commerce acted in accordance with the statutory and regulatory provisions when it based its determination

upon BIA, the only information Commerce had available.  See 19

U.S.C. § 1677e(b); 19 C.F.R. § 355.37.

### 2. Application of BIA to the Merchandise Imported Through a Market Economy Exporter

While 19 C.F.R. § 355.37(a) is reasonably implemented under 19

U.S.C. § 1677e(b), neither the statute nor the regulation explains

whether Commerce may rely on BIA in order to calculate the

antidumping duty rate for merchandise produced in an NME country

but imported into the United States through a market economy

exporter.  See generally, 19 U.S.C. § 1677e(b); 19 C.F.R. § 355.37.

Thus, Commerce's "interpretation of its own regulations must be

given effect so long as it conforms to the purpose and wording of

the regulations," with particular deference given to Commerce's

interpretation in situations where Commerce applied the regulation

"to a complex or changing circumstance, thus requiring the agency

to bring to bear its unique expertise and policy-making

prerogatives."  Southern Cal. Edison Co., 226 F.3d at 1357.

Commerce's practice of reliance on BIA in calculating the

applicable rate is uncontested in cases where Commerce does not

receive a complete, accurate and timely response to its request for

factual information.   See 19 U.S.C. § 1677e(b), 19 C.F.R. § 355.37(a); Def.'s Mem. at 52-55; Pl.'s Br. at 28.  There is nothing in the language of the statute or the regulation inherently limiting the use of BIA to cases concerning merchandise produced in an NME country or purchased from an NME exporter.  See generally, 19 U.S.C. § 1677e, 19 C.F.R. § 355.37; see, e.g., Neuweg Fertigung GmbH v. United States, 16 CIT 724, 797 F. Supp. 1020 (1992) (holding that Commerce was justified in resorting to the use of BIA in calculating the margin for exporter's sales of bearings from Germany under 19 U.S.C. § 1677e(b) where exporter's questionnaire responses were inadequate and untimely).  Conversely, Commerce enjoys very broad, although not unlimited, discretion with regard to the propriety of its use of BIA.  See generally, Olympic Adhesives, Inc. v. United States, 899 F.2d 1565 (Fed. Cir. 1990) (acknowledging Commerce's broad discretion with regard to the use of BIA but pointing out that Commerce's resort to BIA was an abuse of discretion where the information Commerce requested did not and could not exist).  Commerce is justified in its reliance on BIA if the information sought exists and Commerce is unable to receive the information in spite of its bona fide efforts.  See id.; 19 U.S.C. § 1677e(b); 19 C.F.R. § 355.37.

The policy underlying Commerce's action was to prevent "uncooperative PRC producers [from being] free to hide behind and [from] continu[ing to] export[] through low-rate [market economy] exporters." Final Results, 62 Fed. Reg. at 6213. The applicable statutory and regulatory scheme clearly contemplates the importation of merchandise produced in an NME but exported through entities which could be located in market economy countries. Consequently, Commerce applied the regulation to the complex and changing circumstances of the realities of modern trade and acted in accord with the purpose and wording of 19 C.F.R. § 355.37(a) when it extended the application of BIA to the entries of merchandise produced in an NME but exported through market economy entities. Thus, Commerce's determination warrants deference by this Court. See Southern Cal. Edison Co., 226 F.3d at 1356. As the Supreme Court pointed out, "[w]hen the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." Udall v. Tallman, 380 U.S. 1, 16 (1964).

Conversely, the interpretation advocated by Transcom would sabotage the entire review scheme. If an entry of NME-produced merchandise channeled through the hands of a market economy

exporter and undetectable to Commerce was entitled to separate treatment and reevaluation, there would be no incentive for all the other parties in the chain of distribution to participate in the review process.  These parties would be effectively encouraged to remain silent and impair Commerce's review, knowing that they have secured their chance to have a second bite at the apple and to obtain a different rate whenever they pull the ace, a market economy exporter, out of their sleeve.  This is a scenario 19 U.S.C. § 1677e(b) and 19 C.F.R. § 355.37 were design to prevent. The Statement of Administrative Action accompanying the URAA clarifies that "Commerce's potential <u>use of BIA provides the only incentive</u> to foreign exporters and producers to respond to Commerce's questionnaires."  H.R. Doc. No. 103-316, at 868 (1994) (emphasis supplied).


Based on the foregoing, this Court concludes that Commerce acted within the statutory grant of 19 U.S.C. § 1677e(b) and in accordance with 19 C.F.R. § 355.37(a) when it applied the BIA rate (equal to the rate allocated to state-controlled enterprises from the PRC) to the entries of merchandise produced in the PRC but channeled into the United States through exporters from a market economy country.

## III. Fifth Amendment Due Process

### A.    Contentions of the Parties

Transcom argues that "Commerce's failure to provide notice that the two Hong Kong exporters were included in the review and its use of best information available in determining the antidumping rate deprived Transcom of its Fifth Amendment Due Process rights"[15] to notice and an opportunity to be heard prior to a potential deprivation of its property, the additional money Transcom would be required to pay for the entries of its merchandise.  Pl.'s Br. at 4; see Pl.'s Reply Br. at 26 (citing Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950)).

While Timken fails to address the constitutional issue, Commerce asserts that Transcom's Fifth Amendment Due Process rights could not have been violated because Transcom does not have a

---

[15] For reasons not entirely clear to this Court, Transcom added a constitutional Due Process claim under the Fourteenth Amendment to its reply brief.  See Pl.'s Reply Br. at 25.  While the Fourteenth Amendment of the United States Constitution operates upon the states, the Fifth Amendment operates upon the federal government.  See Barron v. Mayor and City Council of Baltimore, 32 U.S. (7 Pet.) 243 (1833); Slaughter-House Cases, 83 U.S. (16 Wall.) 36 (1872).  Considering that Commerce is a federal agency, this Court will only address the issue of procedural Due Process under the Fifth Amendment.

protected property interest in its "right to the continued importation" of its merchandise. Def.'s Mem. at 56. Commerce points out that "no one has a Congressionally untouchable right to the continued importation of product." Id. (citing Arjay Assocs., Inc. v. Bush, 891 F.2d 894 (Fed. Cir. 1989)).

It is impossible to comprehend how an importer's lack of a vested right to import merchandise in the future negates the obligation to provide the importer with notice prior to imposing an antidumping duty for the merchandise already imported. The Court shares Transcom's bewilderment. See Pl.'s Reply Br. at 25-28. The Court shall not entertain Commerce's argument since it fails to differentiate between substantive and procedural Due Process claims and lacks any merit.[16]

This Court has already established that Commerce satisfied the statutory requirements of 19 U.S.C. §§ 1675(a)(1), 1677e(b) and the regulatory requirements of 19 C.F.R. §§ 353.22(c) and 355.37(a). Therefore, the only constitutional issue remaining is whether the

---

[16] This Court pointed out the very same mistake to Commerce two years ago. See Transcom, Inc. v. United States, 22 CIT ___, 5 F.Supp. 2d 984, 990 (1998) rev'd on other grounds, Transcom CAFC, 182 F.3d 876. Obviously, it was to no avail.

particular language Commerce employed in its <u>Notice of Initiation</u> violated Transcom's Due Process right to notice under the Fifth Amendment even though it satisfied Commerce's statutory and regulatory obligations.  The only way Transcom may have a viable claim is if the statutory and regulatory requirements are constitutionally deficient either on their face or as applied. <u>See, e.g.</u>, <u>Kimmes v. Harris</u>, 647 F.2d 1028 (10th Cir. 1981).


### B.    Analysis

It is undisputed that the test for constitutional sufficiency of notice is whether

> [the] notice [is] reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections.  The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance . . . .
>
>        . . . .
>
>        . . . The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected.

<u>Mullane</u>, 339 U.S. at 314, 315 (internal citations omitted).


Thus, there are two issues to analyze: (1) the  reasonableness

of the notice requirement contained in the provisions addressing initiation of review, that is, 19 U.S.C. § 1675(a)(1) and 19 C.F.R. § 353.22(c); and (2) the sufficiency of notice element present in the language of provisions allowing for the use of BIA, that is, 19 U.S.C. § 1677e(b) and 19 C.F.R. § 355.37(a).

### 1.   Notice of Initiation of Review

The statute provides that a review can be conducted "after publication of notice of such review in the Federal Register . . . .," while the regulation requires that a "notice of Initiation of Antidumping Duty Administrative Review" must be published in the Federal Register "[a]fter receipt of a timely request . . . or on [Commerce's] own initiative when appropriate . . . ."  19 U.S.C. § 1675(a)(1); 19 C.F.R. § 353.22(c).

Both provisions expressly mandate that notice to a potentially affected party must be placed in the Federal Register, a publication that a seasoned member of the industry, such as Transcom, is expected to review.  The requirement is constitutional on its face.  See Mullane, 339 U.S. at 318 (a notice by publication is sufficient as to any party whose specific interest or address is unknown).

In addition, the statutory and regulatory requirements were constitutionally applied. Commerce was justified in its good faith decision to designate all parties unknown to Commerce under the term "conditionally covered" while individually naming respondents indicated by Timken. Commerce's action was reasonably certain to inform those parties that could be potentially affected, including Transcom. Accord Mullane, 339 U.S. at 315.

Finally, the extensive explanations contained in Notice of Initiation reasonably conveyed all the information required for a meaningful response: the merchandise at issue, the purpose of the review and actions expected of potentially affected parties. See generally, Notice of Initiation, 59 Fed. Reg. 43,537.

This Court concludes that under the test set forth in Mullane, the statute and the implementing regulation clearly pass constitutional muster, either on their face or as applied. The statutory and regulatory language, taken together with Commerce's publication of the Notice of Initiation (which contained the phrase "other exporters . . . are conditionally covered" and commenced the review that covered the particular merchandise Transcom imported and the POR during which Transcom was dealing), reasonably

alerted Transcom to the fact that its entries may be affected by
Commerce's determination.


### 2.    Notice of Reliance on BIA

The unequivocal language of § 1677e(b) provides for Commerce's
use of BIA whenever an entity subject to a review did not produce
the information requested.  See 19 U.S.C. § 1677e(b).  The language
of the relevant regulation specifies that Commerce may resort to
BIA if it is "unable to verify, within the time specified, the
accuracy and completeness of the factual information submitted."
19 C.F.R. § 355.37(a)(2).


It is hard to craft a notice more plain and straightforward to
advise a potentially affected party like Transcom that its silence
or inaction would lead to Commerce's reliance upon BIA in its
determination of applicable rates.   While neither provision
expressly addresses the particular circumstances of an importer
dealing in merchandise produced in an NME but handled by an
exporter from a market economy, the statute and the regulation do
not violate the Due Process Clause of the Fifth Amendment.   Both
provisions are facially constitutional because the element of
notice requirement, as interpreted by Mullane, does not call for

the statutory or regulatory language to anticipate and spell out every applicable scenario.  The Due Process Clause of the Fifth Amendment merely expects the provisions to apprize interested parties of the alternatives available to Commerce.  See Mullane, 339 U.S. at 314.

Similarly, Commerce's application of the statute and implementing regulation was constitutionally valid.  Commerce is not required or expected to map out every business dealing and every possible chain of distribution of merchandise that could be deemed subject to the review in order for Commerce's action to come within the constitutional safeguards of the Fifth Amendment Due Process Clause.

This Court holds that neither the language nor Commerce's application of 19 U.S.C. § 1675(a)(1) and 19 C.F.R. § 355.37(a) was constitutionally deficient and, therefore, Commerce did not violate Transcom's procedural Due Process rights.

## CONCLUSION

For the foregoing reasons, this Court finds that the form of notice contained in the Notice of Initiation and Commerce's

reliance on BIA in its determination of the applicable antidumping duty rates were: (1) reasonable under the relevant statutes and implemented regulations; and (2) constitutionally sufficient.


_____
                     NICHOLAS TSOUCALAS
                     SENIOR JUDGE

Dated:     November 7, 2000
           New York, New York

**Erratum**

Slip Opinion 00-146

<u>Transcom v. United States</u>, Court No. 97-02-00248

    On page 10, lines 3-5, "<u>See generally</u>, 19 U.S.C. § 1675(a); 19 C.F.R. §§ 353.22, 353.31, 355.31 (1994)" should be "<u>See generally</u>, 19 U.S.C. § 1675(a); 19 C.F.R. §§ 353.22, 353.31 (1994)."

November 21, 2000