**Slip Op. 02-42**

## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:  RICHARD K. EATON, JUDGE**

| | | |
|---|---|---|
| **HUAIYIN FOREIGN TRADE CORPORATION (30); WORLDWIDE LINK, INC.; CAPTAIN CHARLIE SEAFOOD WHOLESALE CO., USA; BOSTON SEAFOOD PROCESSORS, INC.; GMRI, INC.; OCEAN DUKE CORPORATION,** | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | **Court No. 00-05-00240** |
| | : | |
| **UNITED STATES DEPARTMENT OF COMMERCE,** | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| **CRAWFISH PROCESSORS ALLIANCE; LOUISIANA DEPARTMENT OF AGRICULTURE & FORESTRY AND BOB ODOM, COMMISSIONER** | : | |
| | : | |
| Defendant-Intervenors. | : | |

Foreign exporter Plaintiff Huaiyin Foreign Trade Corporation 30 ("Huaiyin 30") and domestic importers (collectively "Plaintiffs") brought action challenging United States Department of Commerce's ("Commerce") findings on review of antidumping duty order covering freshwater crawfish tail meat from the People's Republic of China exported by Plaintiff Huaiyin 30. Plaintiffs moved, pursuant to USCIT R. 56.2, for judgment upon the agency record arguing that Commerce:  (1) violated statutory and regulatory procedures by failing to provide Plaintiffs with adequate notice of and an adequate opportunity to participate in the review investigation; and (2) by issuing its Clarification of Message, caused United States Customs Service ("Customs") improperly to increase Plaintiff Huaiyin 30's cash deposit rate and wrongly apply it retroactively to Plaintiff Huaiyin 30's entries of merchandise.  In addition, Plaintiffs claimed that payment by

the United States Government of antidumping duties to domestic industry pursuant to 19 U.S.C. § 1675c(a) ("Byrd Amendment") changed antidumping statute from one remedial in nature into a statute that imposed a penalty and, therefore, Plaintiffs were entitled to full due process rights including a review proceeding as provided in the Administrative Procedure Act.  United States ("Government"), on behalf of Commerce, argued that Commerce:  (1) provided Plaintiffs with adequate notice of and an adequate opportunity to participate in the review investigation; and (2) properly clarified to Customs that Plaintiff Huaiyin 30 was not entitled to cash deposit based on antidumping duty margin of 91.5 percent.  Finally, Government claimed payment of antidumping duties to domestic industry did not transform antidumping regime into one that imposed a penalty and, therefore, Plaintiffs were not entitled to full due process rights including a review proceeding as provided in Administrative Procedure Act.  United States Court of International Trade, Eaton, J., held:  (1) Commerce provided Plaintiffs with adequate notice of pendency of administrative review, and adequate opportunity to participate in such review; (2) Commerce properly clarified to Customs that Plaintiff Huaiyin 30 was not entitled to cash deposit based on antidumping duty margin of 91.5 percent; and (3) payment of antidumping duties to domestic industry in accordance with Byrd Amendment did not transform antidumping regime into one that imposed a penalty.

[Plaintiffs' motion denied; final determination of Commerce sustained.]


Decided: April 30, 2002


Garvey, Schubert & Barer (William E. Perry and John C. Kalitka) for Plaintiffs Huaiyin Foreign Trade Corporation (30), Worldwide Link, Inc., Captain Charlie Seafood Wholesale Co., USA, Boston Seafood Processors, Inc., GMRI, Inc., and Ocean Duke Corporation.

Robert D. McCallum, Jr., Deputy Assistant Attorney General; David M. Cohen, Director, United States Department of Justice; Velta A. Melnbrencis, Assistant Director, United States Department of Justice, Civil Division, Commercial Litigation Branch.

Adduci, Mastriani & Schaumberg, L.L.P. (James Taylor, Jr. and John C. Steinberger) for Defendant-Intervenors Crawfish Processors Alliance, Louisiana Department of Agriculture & Forestry and Bob Odom, Commissioner.


**OPINION**

**EATON**, **Judge**:  This matter is before the court on the motion of Huaiyin Foreign Trade

Corporation 30 ("Huaiyin 30"), Worldwide Link, Inc., Captain Charlie Seafood Wholesale Co.,

USA, Boston Seafood Processors, Inc., GMRI, Inc., ("GMRI/Red Lobster") and Ocean Duke

Corporation[1] (collectively "Plaintiffs") for judgment upon the agency record pursuant to USCIT R. 56.2. Plaintiffs challenge certain aspects of the first administrative review of the antidumping duty order covering imports of freshwater crawfish tail meat from the People's Republic of China ("PRC") for the period of March 26, 1997, through August 31, 1998. See Freshwater Crawfish Tail Meat From the P.R.C.: Final Results of Administrative Antidumping Duty and New Shipper Reviews, and Final Rescission of New Shipper Review, 65 Fed. Reg. 20,948 (Apr. 19, 2000) ("Final Results"). The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(i)(I). Where a party challenges the findings of an antidumping review, the court will hold unlawful "any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i). For the reasons set forth below, the court denies Plaintiffs' motion and the final determination of the United States Department of Commerce is sustained.

## BACKGROUND

On September 20, 1996, the Crawfish Processors Alliance ("Petitioner"), on behalf of the domestic industry, filed a petition with the United States Department of Commerce ("Commerce") alleging that imports of freshwater crawfish tail meat from the PRC were being sold, or were likely to be sold, in the United States at less than fair value. See Freshwater Crawfish Tail Meat From the P.R.C.; Initiation of Antidumping Investigation, 61 Fed. Reg.

---

[1] As the domestic importers of the subject merchandise, Plaintiffs Worldwide Link, Inc., Captain Charlie Seafood Wholesale Co., USA, Boston Seafood Processors, Inc., GMRI/Red Lobster and Ocean Duke Corporation are "interested parties" within the meaning of 19 U.S.C. § 1677(9).

54,154 (Oct. 17, 1996).[2]  Following receipt of the petition, Commerce initiated an investigation

and sent antidumping questionnaires to various PRC freshwater crawfish tail meat exporters and

producers.  See Notice of Prelim. Determination of Sales at Less Than Fair Value: Freshwater

Crawfish Tail Meat From the P.R.C., 62 Fed. Reg. 14,392, 14,393 (Mar. 26, 1997)

("Investigation Prelim. Determination").  Questionnaire responses were received from numerous

companies,[3] including Huaiyin Foreign Trade Corporation ("HFTC").[4]  Plaintiff Huaiyin 30, an

---

[2]        The period of investigation covered 1996–97 and

> [t]he product covered by this investigation is freshwater crawfish
> tail meat, in all its forms (whether washed or with fat on, whether
> purged or unpurged), grades, and sizes; whether frozen, fresh, or
> chilled; and regardless of how it is packed, preserved, or prepared.
> Excluded from the scope of the investigation are live crawfish and
> other whole crawfish, whether boiled, frozen, fresh, or chilled.
> Also excluded are saltwater crawfish of any type and parts thereof.

See Freshwater Crawfish Tail Meat From the P.R.C.; Initiation of Antidumping Investigation, 61
Fed. Reg. at 54,155.

[3]        The following companies submitted questionnaire responses:  China Everbright
Trading Company, Binzhou Prefecture Foodstuffs Imp. & Exp. Corp., Yancheng Fengbao
Aquatic Food Co., Ltd., Yancheng Foreign Trade Corp., Huaiyin Foreign Trade Corp., Jiangsu
Cereals, Oils & Foodstuffs Imp. & Exp. Corp., Jiangsu Light Industrial Prods. Imp. & Exp.
(Group) Yangzhou Co., Lianyungang Yupeng, Jiangsu Overseas Group Corp., Anhui Cereals,
Oils & Foodstuffs Imp. & Exp. Corp., Qidong Baolu Aquatic Prods. Co., Ltd., Shandong
Foodstuffs Imp. & Exp. parte. Corp., Nantong Delu Aquatic Food Co., Ltd., Huaiyin Ningtai
Fisheries Co., Ltd., and Yancheng Baolong Aquatic Foods Co., Ltd.  See Investigation Prelim.
Determination, 62 Fed. Reg. at 14,393.

[4]        Among the complicating factors in this action is the confusion resulting from the
similarity in names of the various PRC entities—i.e., Huaiyin Foreign Trade Corp., Huaiyin
Foreign Trade Corporation 5 ("Huaiyin 5") and Huaiyin Cereals, Oils & Foodstuffs Import and
Export Corporation are a single concern—while Plaintiff Huaiyin 30 is an unrelated entity.

entity unrelated to HFTC, took no part in the proceedings.[5]  As it had done previously,

Commerce treated the PRC as a nonmarket economy country[6] and, thus, companies wishing to

receive a company-specific antidumping duty margin were required to demonstrate an absence of

state control.  Id. at 14,394.  In its questionnaire response, HFTC indicated that it was applying

for a separate company-specific margin.  Id.

        In August of 1997, Commerce completed its investigation and established antidumping

duty margins for individual producers and for the PRC as a whole.  HFTC demonstrated the

requisite absence of state control and, thus, its company-specific antidumping duty margin was

set at 91.5 percent.  See Notice of Final Determination of Sales at Less Than Fair Value:

Freshwater Crawfish Tail Meat From the P.R.C., 62 Fed. Reg. 41,347, 41,349 (Aug. 1, 1997),

amended by, Notice of Amendment to Final Determination of Sales at Less Than Fair Value and

Antidumping Duty Order: Freshwater Crawfish Tail Meat From the P.R.C., 62 Fed. Reg. 48,219

(Sept. 15, 1997) ("The ad valorem weighted-average dumping margins are as follows . . .

Huaiyin Foreign Trading Corporation . . . 91.50" percent.) ("LTFV Final Determination").  As

---

[5]        In their papers Plaintiffs assert that, "[a]s stated to [Commerce] in its
questionnaire response, [Plaintiff] Huaiyin 30 paid its legal fees to the lawyer in the initial
investigation . . . . Unfortunately, [Plaintiff] Huaiyin 30 was misled.  The lawyer did not file any
documents for [Plaintiff] Huaiyin 30 on the record of the initial investigation."  (Pls.' Mem.
Supp. Mot. J. Agency R. at 2.)

[6]        A nonmarket economy is defined by the antidumping statute as "any foreign
country that the administering authority determines does not operate on market principles of cost
or pricing structures, so that sales of merchandise in such country do not reflect the fair value of
the merchandise."  19 U.S.C. § 1677(18)(A) (1994).  "Any determination that a foreign country
is a nonmarket economy country shall remain in effect until revoked by the administering
authority."  19 U.S.C. § 1677(18)(C)(i).  Commerce's designation of China as a nonmarket
economy country is not disputed.

Plaintiff Huaiyin 30 took no part in the proceedings, it was assigned the PRC-wide antidumping

duty margin of 201.63 percent, as were all other exporters of crawfish tail meat that did not

establish their independence from government control. See id. at 41,349 ("We are applying a

single antidumping [PRC] rate . . . to all exporters in the PRC other than those firms that were

fully responsive to our requests for information."). Commerce based this "determination . . . on

[the] presumption that the export activities of the companies that failed to" demonstrate the

absence of state control "are controlled by the PRC government." Id. (citation omitted).

Therefore, because it did not qualify for a separate rate in the investigation, Plaintiff Huaiyin 30

was assigned the PRC-wide antidumping duty margin of 201.63 percent. (See Issue and

Decision Mem., 04/07/2000, Pub. R. Doc. 214 at 124 ("[Plaintiff Huaiyin 30] has never qualified

for a separate rate, either in this review or the LTFV investigation . . . .").)


        According to Plaintiffs, following the issuance of the LTFV Final Determination, events

transpired outside of the context of any Commerce proceeding that affected the subsequent

course of events. First, upon learning that HFTC had received a lower rate than Plaintiff Huaiyin

30, the local PRC government concluded that Plaintiff Huaiyin 30 should take advantage of

HFTC's lower rate:

> After the 1996 crawfish investigation, HFTC[] got a relatively low
> antidumping duty rate while [Plaintiff] Huaiyin 30 got a much
> higher rate. [Plaintiff] Huaiyin 30 and other local crawfish
> exporters wanted to use HFTC['s] low rate. HFTC[] was unhappy
> about this and asked the Committee for assistance. . . . [T]he
> Committee and other local companies felt that HFTC[] should
> share its rate with other local exporters.

(Pls.' Mem. Supp. Mot. J. Agency R. at 8 (citing Committee Verification Report, Pub R. Doc.

185 at 3) (emphasis in Pls.' Mem.).) Thus, despite having been assigned the PRC-wide antidumping duty margin of 201.63 percent, Plaintiff Huaiyin 30 took advantage of HFTC's separate company-specific antidumping duty margin of 91.5 percent when exporting its product to the United States. This decision on the part of the local PRC government appears to have raised questions in the minds of Plaintiff Huaiyin 30's customers who consequently made inquiries. On this point, Plaintiffs state that GMRI/Red Lobster:

> [M]et with the Vice Director of the China Commodities Inspection Bureau . . . and the Vice General Manager of [Plaintiff Huaiyin] 30 . . . . These gentleman assured [GMRI/Red Lobster that Plaintiff Huaiyin] 30 was entitled to the 91.5% tariff. When asked . . . for documentation they produced a circular from their industry association which clearly stated Huaiyin Foreign Trade Corporation was entitled to the 91.5% tariff. They also produced a letter from the US Embassy in Beijing which stated Huaiyin Foreign Trade Corp., without specifying numbers, had the benefit of the 91.5% tariff. The officials with whom [GMRI/Red Lobster] were meeting proffered those documents as substantiation for their representation [that] any crawfish purchased from [Plaintiff Huaiyin] 30 could be imported into the US under the 91.5% rate.

(Response of Worldwide Link, Inc., et al., Supplemental Questionnaire of 02/17/00, Pub. R. Doc. 172 at 7; see also Pls.' Mem. Supp. Mot. J. Agency R. at 6). In addition, Plaintiffs assert that,

> GMRI/Red Lobster, made numerous attempts to contact the U.S. government, including [Commerce] to determine whether the 91.5% cash deposit rate for Huaiyin Foreign Trade Corp. applied to [Plaintiff] Huaiyin 30 before importing crawfish from [Plaintiff] Huaiyin 30. Red Lobster contacted [Plaintiff] Huaiyin 30 and [HFTC], the U.S. Embassy and [Commerce] itself seeking clarification in the summer of 1998. After seeking such clarification and receiving only a copy of the antidumping order with the 91.5% cash deposit rate for Huaiyin Foreign Trade Corp., in the summer of 1998, Red Lobster imported the crawfish from [Plaintiff] Huaiyin 30 relying on the language in the antidumping order.

(Pls.' Mem. to Commerce of 11/14/99, Pub. R. Doc. 125 at 15–16; see also Pls.' Mem. Supp.

Mot. J. Agency R. at 37–38.)

The antidumping order remained unchallenged until September 1998. At that time, Commerce "received a request from [Petitioner] to conduct an administrative review of the antidumping order on freshwater crawfish tail meat from the PRC." See Notice of Preliminary Results of Antidumping Duty Administrative Review and New Shipper Reviews, Partial Rescission of the Antidumping Duty Administrative Review, and Rescission of the New Shipper Review for Yancheng Baolong Biochemical Products, Co. Ltd.: Freshwater Crawfish Tail Meat From the P.R.C., 64 Fed. Reg. 55,236, 55,237 (Oct. 12, 1999) ("Prelim. Results"). In its request, Petitioner identified certain exporters of crawfish tail meat, including "Huaiyin Foreign Trade Corp." for review. (See letter from Ablondi & Foster to Commerce of 9/30/98, Pub. R. Doc. 3 at 2); see also Initiation of Antidumping and Countervailing Duty Administrative Review, Requests for Revocation in Part and Deferral of Administrative Reviews, 63 Fed. Reg. 58,009, 58,010 (Oct. 29, 1998) ("Notice of Initiation"). Petitioner did not, however, name Plaintiff Huaiyin 30 in its petition and Commerce did not specifically name it in the Notice of Initiation. (See letter from Ablondi & Foster to Commerce of 9/30/98, Pub. R. Doc. 3 at 2); Notice of Initiation, 63 Fed. Reg. at 58,010. Commerce then sent questionnaires to the PRC crawfish tail meat exporters identified in the Notice of Initiation.

Thereafter, in September 1999, "[a]fter an . . . inquiry from" the United States Customs Service ("Customs"), (Def.'s Mem. Opp'n to Mot. J. Agency R. at 22.), Commerce issued a "Clarification of Message" to Customs regarding which company was actually entitled to a cash

deposit based on the separate lower "HFTC" antidumping duty margin. (Def.'s Mem. Opp'n to Mot. J. Agency R., Ex. 7 at 4; Def.'s Mem. Opp'n to Mot. J. Agency R. at 22.) The Clarification of Message stated that HFTC "was also known as" Huaiyin 5 and, therefore, per the LTFV Final Determination "only freshwater crawfish tail meat [entries] imported from" HFTC or Huaiyin 5[7] were entitled to a cash deposit based on the separate company-specific antidumping duty margin of 91.5 percent. (Def.'s Mem. Opp'n to Mot. J. Agency R., Ex. 7 at 4; Pls.' Mem. Supp. Mot. J. Agency R. at 10 (citation omitted).) As a result, imported crawfish tail meat entries from Plaintiff Huaiyin 30 were to be entered with a cash deposit based on the PRC-wide antidumping duty margin of 201.63 percent. In addition, in accordance with Commerce's instructions, Customs imposed a cash deposit based on the PRC-wide antidumping duty margin of 201.63 percent on all Plaintiff Huaiyin 30's 1997–98 crawfish tail meat entries imported into the United States. (Id.) Consequently, certain domestic importers[8] of Plaintiff Huaiyin 30's crawfish tail meat were required "to post additional cash deposits of approximately 110" percent to cover the difference. (Pls. Mem. Supp. Mot. J. Agency R., App. Tab 5 at 12.)

On October 12, 1999, Commerce issued its preliminary findings for the administrative review of the antidumping order. See Prelim. Results, 64 Fed. Reg. at 55,236. Commerce

---

[7]    Commerce, in making its clarification, stated that the entity known to it as Huaiyin 5 "is the same entity that submitted the sales and factors information on which [Commerce] based the separate rate . . . in the LTFV investigation" and, therefore, Huaiyin 5 was entitled to a cash deposit based on HFTC's separate company specific antidumping duty margin of 91.5 percent. (See Issue and Decision Mem., Pub. R. Doc. 214 at 138.) As previously noted in footnote 4 supra, HFTC and Huaiyin 5 constitute the same entity.

[8]    The importers affected by Commerce's Clarification of Message include the domestic importer Plaintiffs. (Pls.' Mem. Supp. Mot. J. Agency R., App. Tab 5 at 1.)

preliminarily determined that sales of crawfish tail meat imported into the United States from the

PRC were made below normal value during the period of investigation. In making its

determination, Commerce continued to treat the PRC as a nonmarket economy country. Id. at

55,241 ("In every case conducted by [Commerce] involving the PRC, the PRC has been treated

as an [nonmarket economy] country."). As such, Commerce followed its policy[9] that "exporters

in [nonmarket economy countries] are entitled to separate, company-specific margins [if] they

can demonstrate an absence of government control, both in law and in fact, with respect to [their]

export activities." Id. at 55,240. Companies that did not request a separate rate, and companies

unable to demonstrate an absence of state control would be assigned the PRC-wide rate. Id. In

determining "the PRC-wide rate, [Commerce] used the highest rate from the petition, . . . which

was [also] the PRC-wide rate in the" LTFV Final Determination. See Prelim. Results, 64 Fed.

Reg. at 55,239. Consequently, Commerce continued to assess the PRC-wide antidumping duty

margin, found in the initial investigation, of 201.63 percent. Id.


Following the review of comments on the Prelim. Results received from interested

parties, including Plaintiff Huaiyin 30, Commerce issued the Final Results on April 19, 2000. In

the Final Results, Commerce made no changes to the margin calculations with respect to HFTC

_____

[9]        Commerce also followed its policy "that [a] separate-rates questionnaire must be
[submitted and] evaluated each time a respondent makes a separate rate claim, regardless of any
separate rate the respondent received in the past." See Prelim. Results, 64 Fed. Reg. at 55,239
(citation omitted). Thus, HFTC had the burden of demonstrating, again, its independence from
PRC governmental control. Commerce, however, was unable to perform verification of HFTC,
because "the company refused to permit verification . . . of its questionnaire response." Id. at
55,238 (citation omitted). As such, Commerce did "not use the information" submitted in
HFTC's questionnaire. Instead, Commerce decided that "the use of [facts available was]
required for" HFTC. Id. (citation omitted).

and Plaintiff Huaiyin 30 from the margins set out in the Prelim. Results. See Final Results, 65

Fed. Reg. at 20,949. Instead, Commerce concluded that HFTC and Huaiyin 5 constituted a

single company, and that such company failed to demonstrate an absence of state control. Thus,

crawfish tail meat entries labeled with either name were assigned the PRC-wide antidumping

duty margin of 201.63 percent. Id. In addition, Commerce determined that, since Plaintiff

Huaiyin 30 had "not requested a separate rate" in the administrative review, it was not "entitled

to a separate rate . . . . [Therefore,] all Chinese exporters not specifically named" in the Notice of

Initiation that did not demonstrate an absence of state control "including [Plaintiff Huaiyin 30]

were subject to the" PRC-wide rate. Id. ("Huaiyin Foreign Trade Corporation (30) . . . [is]

subject to the PRC-wide rate of 201.63%.").


                                       **DISCUSSION**

        Plaintiffs claim that Commerce: (1) violated statutory and regulatory procedures by

failing to provide Plaintiffs with adequate notice of and an adequate opportunity to participate in

the review investigation; and (2) by issuing its Clarification of Message, caused Customs

improperly to increase Plaintiff Huaiyin 30's cash deposit rate and wrongly apply it retroactively

on Plaintiff Huaiyin 30's entries of merchandise imported into the United States. In addition,

Plaintiffs complain that payment by the United States Government of antidumping duties to the

domestic industry, pursuant to 19 U.S.C. § 1675c(a), changes the antidumping statute from one

remedial in nature into a statute that imposes a penalty and, therefore, Plaintiffs were entitled to

full due process rights including a review proceeding as provided in the Administrative

Procedure Act.[10]

The United States ("Government"), on behalf of Commerce argues that Commerce: (1) provided Plaintiffs with adequate notice of and an adequate opportunity to participate in the review investigation; and (2) properly clarified to Customs that Plaintiff Huaiyin 30 was not entitled to a cash deposit based on the antidumping duty margin of 91.5 percent. Finally, the Government claims that payment of antidumping duties to the domestic industry does not transform the antidumping regime into one that imposes a penalty and, therefore, Plaintiffs were not entitled to full due process rights including a review proceeding as provided in the Administrative Procedure Act.

I.      **Adequate Notice Of and An Adequate Opportunity To Be Heard**

In their brief, Plaintiffs argue that they were given neither adequate notice of nor an adequate opportunity to participate in the administrative review because Commerce "did not name [Plaintiff] Huaiyin 30 in its Notice of Initiation . . . ." (Pls.' Mem. Supp. Mot. J. Agency R. at 29.) In addition, Plaintiffs contend that "despite [Commerce's] clear instructions to specify each individual producer or exporter for review, the Petitioner[] did not request that [Plaintiff] Huaiyin 30 be reviewed." (Id. at 24.) In support of their argument, Plaintiffs rely on two related regulations. The first, 19 C.F.R § 351.213, provides in relevant part: "Each year during the

---

[10]    See 5 U.S.C. § 551 et seq. (1994); see also GSA, S.R.L., v. United States, 23 CIT 920, 931, 77 F. Supp. 2d 1349, 1359 (1999) (stating that "the APA does not apply to antidumping administrative proceedings."); 19 U.S.C. 1677c(b)(providing that an administrative hearing "shall not be subject to the provisions . . . of title 5 . . . of" the APA).

anniversary month of the publication of an antidumping . . . order, a domestic interested party . . . may request . . . that the Secretary conduct an administrative review . . . of specified individual exporters or producers covered by an order . . . ." 19 C.F.R § 351.213(b)(1). The second, 19 C.F.R. § 351.221, states that pursuant to subsection 351.213(b)(1): "In an administrative review . . . the Secretary . . . [w]ill publish the notice of initiation of the review no later than the last day of the month following the anniversary month . . . ." 19 C.F.R. § 351.221(c)(1)(i). Thus, Plaintiffs claim that because Commerce "did not include [Plaintiff] Huaiyin 30 in its Notice of Initiation" by specifically naming it, "neither [Plaintiff] Huaiyin 30 nor the Plaintiff importers . . . received any real notice of the 1997–98 administrative review." (Pls.' Mem. Supp. Mot. J. Agency R. at 26.)

The Government, on the other hand, argues that "Commerce need not give personal notice to any party that could be affected by an administrative review" and, therefore, it was "free to choose a variety of means to give reasonable notice that certain exporter's goods [were] subject to an administrative review." (Def.'s Mem. Opp'n to Mot. J. Agency R. at 13.) As such, the Government claims that the constructive notice provided by the Notice of Initiation "adequately advised [Plaintiff Huaiyin] (30) and its importers that they would be subject to the administrative review" of the antidumping order covering imports of crawfish tail meat from the PRC. (Id.) In other words, "the statement contained in the Notice of Initiation clearly advised [Plaintiffs] that if any of the listed exporters did not qualify for a separate rate, all of the exporters of crawfish tail meat from the PRC would be subject to [the administrative] review." (Id. at 14–15.)

The court is not convinced of Plaintiffs' arguments that they were provided with inadequate notice by the Notice of Initiation. On this matter, Transcom, Inc. v. United States, 182 F.3d 876 (Fed. Cir. 1999) ("Transcom I") and two later Transcom decisions of this court[11] are instructive. As here, Transcom I involved an administrative review of an antidumping order affecting an exporter from a nonmarket economy country that was not named in a notice of initiation. The CAFC found the notice of initiation at issue[12] to be inadequate because the importer:

> [H]ad no reason to expect that the antidumping duties on its
> exporters' products could be affected by proceedings in which the
> exporters were not named as parties. Neither the statute nor

---

[11]     See Transcom, Inc. v. United States, 24 CIT __, 121 F. Supp. 2d 690 (Nov. 7, 2000) ("Transcom II") (finding notice of initiation at issue provided adequate notice); Transcom, Inc. United States, 24 CIT __, 123 F. Supp. 2d 1372 (Nov. 22, 2000) (finding notice of initiation at issue failed to provide adequate notice).

[12]     In Transcom I, the government argued that Commerce's notice of initiation, which specifically named certain companies for review, was also sufficient to alert unnamed exporters of tapered roller bearings to the scope of the administrative review because:

> [A]ll exporters in a nonmarket economy country are presumed to
> be part of the state-controlled entity . . . . [T]hat if any company
> named in the administrative review is found to be part of the state-
> controlled entity, the effect of that finding is to bring within the
> scope of the review any other exporters from that country that fail
> to demonstrate their independence from the state-controlled entity.
> According[ly] . . . if the unnamed exporters wish[] to avoid having
> the PRC rate applied to their exports, they should . . . voluntarily
> participate[] in the review[] and demonstrate[] their independence
> from the nonmarket economy entity.

Transcom I, 182 F.3d at 881. The CAFC found, however, that the use of this language represented a new policy for Commerce to which it did not alert potentially affected parties. Thus, the new policy, together with the language itself led the CAFC to conclude "that Transcom had no reason to expect that the antidumping duties on its exporters' products could be affected by proceedings in which the exporters were not named as parties. Id.

Commerce's regulations gave any hint that such a procedure would be used.  Moreover, at the time of the administrative reviews at issue in this case, Commerce had not announced that it would be following a different practice with respect to unnamed exporters in administrative reviews of products from nonmarket economy countries . . . .

Transcom I, 182 F.3d at 881.  Thus, the CAFC held, inter alia, that Commerce was required to "provide some form of notice that the administrative review may . . . increase . . . the antidumping duty rates applicable to its [unnamed] foreign exporters."  Id. at 884.  This being the case, Plaintiffs would be entitled to the relief they seek, if it were shown that the Notice of Initiation failed adequately to alert them that their interests might have been affected by the pending administrative review.  Here, the Notice of Initiation reads in relevant part:

> If one of the above named companies does not qualify for a separate rate, all other exporters of freshwater crawfish tail meat from the People's Republic of China who have not qualified for a separate rate are deemed to be covered by this review as part of the PRC entity of which the named exporter is part.

Notice of Initiation, 63 Fed. Reg. at 58,010.  Plaintiffs argue that this notice was inadequate and, therefore, they "did not request a review investigation" or "participate in the review simply because they did not know" about the pendency of the administrative review.  (Pls.' Mem. Supp. Mot. J. Agency R. at 34.)[13]  Again, Transcom I is instructive.  There, the CAFC found it

---

[13]     The Government, on the other hand, contends that the language in the Notice of Initiation "is no less clear than" the language in the notice of initiation at issue in Transcom II and, therefore, the court should conclude, as the court did in Transcom II, that Plaintiffs had sufficient "notice that the entries in which [they] had an interest could . . . be affected by the administrative review . . . ."  (Def.'s Mem. Opp'n to Mot. J. Agency R. at 14.)  The notice of initiation at issue in Transcom II was described by the court as follows, "In addition to listing the one hundred and one companies subject to the review, the 'Notice of Initiation' provided that '[a]ll other exporters of tapered roller bearings are conditionally covered by this review.'"  Transcom II, 24 CIT at __, 121 F. Supp. 2d at 700.  The court found that this language "gave

(continued...)

persuasive that the language of the notice of initiation, at issue in that case, had not previously

been used and that, therefore, unnamed exporters had inadequate notice of a change in

Commerce's policy that put them at risk with respect to their merchandise.  The CAFC did

acknowledge that following publication of such notice of initiation Commerce:

> [B]egan stating in notices of initiation . . . that all unnamed
> exporters . . . from the People's Republic of China are
> conditionally covered by the review or, more explicitly, that if one
> of the named companies does not qualify for a separate rate, all
> other exporters that have not qualified for a separate rate are
> deemed to be covered by the review as part of the single Chinese
> entity of which the named exporters are a part.[14]

Transcom I, 182 F.3d at 882.  Though the CAFC declined to find that this new language

"satisf[ied] statutory and regulatory notification requirements[,]" it did observe that such

language went "far beyond any notice, constructive or otherwise, given to the unnamed

exporters" in that case.  Id.


In addition, the CAFC stated that since Commerce was not "required to give personal

notice to any party that could be affected by an administrative review that its interests may be at

---

13(...continued)
Transcom . . . more than sufficient . . . notice that the particular entries in which Transcom had an interest could possibly be affected by the administrative review." Id., 24 CIT at __, 121 F. Supp. 2d at 701 (footnote omitted).

14       Commerce has been using this notice of initiation language in administrative reviews of antidumping orders covering PRC exporters since August 1, 1997. See, e.g., Action: Notice of Initiation of Antidumping and Countervailing duty Administrative Reviews and Request For Revocation In Part, 62 Fed. Reg. 41,339, 41,345 (Aug. 1, 1997).  This language is of the same import as the language used in the Notice of Initiation at issue here, and had been in use for more than a year prior to the Notice of Initiation being published.  Thus, there is no serious argument that the language used in the Notice of Initiation represented a change in policy.

stake[,]" id. (citation omitted), constructive notice by publication was adequate.[15] Moreover, the CAFC did not find that a party must be specifically named for a notice of initiation to be adequate. Rather, the CAFC concluded that 19 U.S.C. § 1675(a)[16] and 19 C.F.R. §§ 351.213(b)(1) and 351.221(c)(1), when taken together, provide "that any reasonably informed party should be able to determine, from the published notice of initiation read in light of announced Commerce policy, whether particular entries in which it has an interest may be affected by the administrative review." See Transom I, 182 F.3d at 882–83. Thus, the CAFC did not find that only those specific parties named by domestic producers could be affected by the proceedings announced in a notice of initiation, or that such notice could only be adequate as to named parties rather than to a class. Id. at 882–83.

---

[15] See also Transcom, II, 24 CIT at __, n.10, 121 F. Supp. 2d at 701, n.10 ("Constructive notice is information or knowledge of a fact imputed by law to a person . . . because he could have discovered the fact by proper diligence, and his situation was such as to cast upon him the duty of inquiring into it. . . ." (citation omitted)).

[16] Subsection 1675(a) of title 19 provides, inter alia:

> At least once during each 12–month period beginning on the anniversary of the date of publication of . . . an antidumping duty order . . . the administrating authority, if a request for such a review has been received and after publication of notice of such review in the Federal Register, shall . . .
>
> > (B) review, and determine . . . the amount of any antidumping duty . . .
>
> and shall publish in the Federal Register the results of such review, together with notice of any duty to be assessed, estimated duty to be deposited, or investigation to be resumed.

19 U.S.C. § 1675(a)(1)(B).

Here, the notice given to Plaintiffs satisfies the CAFC's criteria. First, Plaintiff Huaiyin 30 was a "reasonably informed" party by virtue of its being a PRC producer of crawfish tail meat that had previously: (1) tried to participate in the original crawfish tail meat antidumping investigation and seek a company-specific antidumping duty margin therein; and (2) taken advantage of HFTC's cash deposit, which was based on HFTC's separate company-specific antidumping duty margin. As such, Plaintiff Huaiyin 30, though not specifically named, was well situated to determine from the Notice of Initiation that its 1997–98 crawfish tail meat entries could be affected by the administrative review. Second, the domestic importer Plaintiffs can also be found to be "reasonably informed" parties to whom the Notice of Initiation provided adequate notice. These Plaintiffs were fully aware that an entity with "Huaiyin" in its name was supplying them with crawfish tail meat. They received a copy of the antidumping order which, together with Plaintiff Huaiyin 30's representations, apparently convinced them that they were being supplied by the "Huaiyin" entity that was named in the antidumping order as the one entitled to take advantage of the cash deposit based on the company-specific antidumping duty margin of 91.5 percent. As this was the same entity that was specifically named in the Notice of Initiation,[17] Plaintiffs cannot now be heard to claim that, at the time the Notice of Initiation was published (October 29, 1998 nearly a year prior to the issuance of the Clarification of Message), they did not believe that the "Huaiyin" entity named in the Notice of Initiation was their supplier.

---

[17]     See LTFV Final Determination, 62 Fed. Reg. at 48,219 ("The ad valorem weighted-average dumping margins are as follows . . . Huaiyin Foreign Trade Corp. . . . 91.50" percent.); see also Notice of Initiation, 63 Fed. Reg. at 58,009–10 ("The Department of Commerce has received requests to conduct administrative reviews of various antidumping . . . orders and findings with September anniversary dates. In accordance with the Department's regulations, we are initiating review[]" of the following company: "Huaiyin Foreign Trade Corp.").

Thus, the domestic importer Plaintiffs had reason to believe that the crawfish tail meat entries in which they had an interest could be affected by the administrative review.

Because they received adequate notice, the court is necessarily unpersuaded by Plaintiffs' claim that they could not have participated in the administrative review until after the Prelim. Results were published. As noted above, Plaintiff Huaiyin 30 is a crawfish tail meat exporter that had reason to expect that, at the time the Notice of Initiation was published, its 1997–98 crawfish tail meat entries could be affected by the administrative review. Moreover, as Commerce specifically named the "Huaiyin" entity in the Notice of Initiation that the domestic importer Plaintiffs believed to be their crawfish tail meat supplier, they cannot claim that the Notice of Initiation failed adequately to alert them of the pendency of the administrative review. As to the time frame during which Plaintiffs were given an opportunity to participate in the review investigation, the Notice of Initiation quite clearly stated that, "[i]f one of the [specifically] named companies does not qualify for a separate rate, all other exporters . . . who have not qualified for a separate rate are deemed to be covered by this review . . . ." See Notice of Initiation, 63 Fed. Reg. at 58,010. Thus, Plaintiffs were given a choice, at the time the Notice of Initiation was published, to either participate in the review by seeking a separate company-specific antidumping duty margin, or risk being assigned the PRC-wide rate should any named company fail to qualify for a separate rate. By choosing not to participate in the review investigation, Plaintiffs and any other similarly situated entities, risked the consequences of their inaction. The court, therefore, finds that the Notice of Initiation gave adequate notice to Plaintiffs of the pendency of the administrative review, and that Plaintiffs had an adequate

opportunity to participate in such review.


## II.    Commerce's Clarification of Message To Customs

The next question presented is whether Commerce properly clarified to Customs which PRC exporter was entitled to take advantage of cash deposits based on the antidumping duty margin of 91.5 percent. Plaintiffs do not dispute Commerce's authority to apply a presumption of state control and assess a PRC-wide antidumping duty margin where a PRC exporter fails to demonstrate an absence of state control. Rather, Plaintiffs argue that Commerce's Clarification of Message to Customs—that only the entity known as HFTC or Huaiyin 5 was entitled to the lower cash deposit based on the antidumping duty margin of 91.5 percent—was improper, because Plaintiffs relied "in good faith upon [Commerce]'s mistake" of allowing Customs to assign a cash deposit to Plaintiff Huaiyin 30's entries of merchandise based on the lower antidumping duty margin of 91.5 percent. Plaintiffs, further, argue that Commerce "should not be . . . allowed to gain a windfall as a direct result of its mistake by applying retroactive duties" to Plaintiff Huaiyin 30's 1997–98 crawfish tail meat entries. (Pls.' Mem. Supp. Mot. J. Agency R. at 44.)


The Government, on the other hand, argues that "Commerce did not make a mistake." The Government contends that "[d]uring the . . . investigation [leading to the LTFV Final Determination], Commerce determined that the HFTC entity that participated . . . and responded to Commerce's requests for information was entitled to a separate rate of 91.5 percent ad valorem," and, therefore, "[t]he clarification merely stated HFTC's address and the two other

names under which it was known."[18]  (Def.'s Mem. Opp'n to Mot. J. Agency R. at 24.)  In

addition, the Government argues that, since HFTC "advised Commerce for the first time on

August 31, 1999 that its official name was" HFTC, Commerce, therefore, "did not make a

mistake in assigning the 91.5 percent rate in the" LTFV Final Determination to HFTC  "because

that was how the HFTC entity that was investigated represented itself during the investigation."

(Id. at 25–26 (citations omitted.)  Finally, the Government contends that "Commerce[] had no

reason to refer to" Plaintiff Huaiyin 30 in the LTFV Final Determination "because Commerce

was not even aware of the existence of [Plaintiff Huaiyin 30] during the investigation."  (Id. at

26.)


Plaintiffs' argument that Commerce's September 1999 Clarification of Message had

improper results is unconvincing.  Commerce's Clarification of Message merely alerted Customs

as to which PRC crawfish tail meat exporter was entitled to avail itself of cash deposits based on

the separate company-specific antidumping duty margin.  That this exporter was HFTC and not

Plaintiff Huaiyin 30 in no way means that the United States Treasury gained a "windfall."  First,

the local PRC government's decision to allow Plaintiff Huaiyin 30 to use HFTC's separate

company-specific antidumping duty margin of 91.5 percent was in no way authorized by

Commerce.  Second, Plaintiff Huaiyin 30 was fully aware that it had been assigned the PRC-

wide antidumping duty margin but, nonetheless, participated in taking advantage of cash deposits

based on HFTC's lower rate when exporting its product to the United States.  As Plaintiff

Huaiyin 30 did not take part in either the original investigation or the administrative review, it

---

[18]      See footnote 4, supra.

cannot now claim any entitlement to cash deposits based on a company-specific antidumping

duty margin. With respect to the domestic importer Plaintiffs, their reliance on their inadequate

investigation and on Plaintiff Huaiyin 30's representations cannot be attributed to Commerce.

Commerce can hardly be held accountable for the similarity among exporters' names and a

supplier's deceptive business practices. Commerce had no reason to know that Plaintiff Huaiyin

30 existed prior to Custom's inquiry in September of 1999 and, thus, no reason to make a

distinction among the "Huaiyin" named entities until such time. Thus, the claims of both

Plaintiff Huaiyin 30, and the domestic importer Plaintiffs of "good faith" reliance or the history

of Customs applying HFTC's cash deposit rate to Plaintiff Huaiyin 30's merchandise are not

credible.

### III.     Continued Dumping and Subsidy Offset Act of 2000

Plaintiffs' final argument is that the Continued Dumping and Subsidy Offset Act of 2000,

19 U.S.C. § 1675c (2000) ("Byrd Amendment"), transforms the antidumping statute[19] from being

remedial in nature into a law that imposes penalties. (Pls.' Mem. Supp. Mot. J. Agency R. at 49.)

Prior to enactment of the Byrd Amendment, duties collected pursuant to antidumping orders

were deposited with the Treasury for general purposes. By enactment of the Byrd Amendment,

however, Congress modified the antidumping statute so that "[d]uties assessed pursuant to . . . an

antidumping order . . . shall be distributed on an annual basis . . . to the affected domestic

producers . . . ." 19 U.S.C. § 1675c(a). In other words, as a result of the Byrd Amendment, these

duties are to be distributed to the firms that petitioned for relief, and to those firms that supported

---

[19]      Section 516A of the Tariff Act of 1930, <u>as amended</u>, 19 U.S.C. § 1516a (1994).

the petition.  See 19 U.S.C. § 1675c(b)(1)(A), (B).

It is well settled that the antidumping statute, as it existed prior to enactment of the Byrd

Amendment, did not impose a penalty.  An early decision of the United States Court of Customs

and Patent Appeals reviewed the nature of the antidumping statute and found that:

> [W]e cannot escape the conviction that the expressed purpose of
> Congress, in the Antidumping Act of 1921, was to impose not a
> penalty, but an amount of duty sufficient to equalize competitive
> conditions between the exporter and American industries
> affected . . . . It follows that the Antidumping Act of 1921 is not
> repugnant to the provisions of said Amendment V [to the U.S.
> Constitution], as denying to the importer due process of law . . . .

C.J. Tower & Sons v. United States, 21 C.C.P.A. 417, 427–28, 71 F.2d 438, 445–46 (1934).

Since C.J. Tower courts have continued to find that, "[d]umping duties are not penal in nature,

but are 'additional duties' to equalize competitive conditions between the exporter and [affected

U.S. industries]."  See Union Camp Corp. v. United States, 22 CIT 267, 278, 8 F. Supp. 2d 842,

852 (1998) (citing Imbert Imp., Inc. v. United States, 67 Cust. Ct. 569, 576 n.10, 331 F. Supp.

1400, 1406 n.10 (1971), aff'd, 60 C.C.P.A. 123, 475 F.2d 1189 (1973)).  Moreover, because the

imposition of these duties was "not penal, retaliatory or compensatory," Chr. Bjelland Seafoods

A/C v. United States, 16 CIT 945, 953 (1992) (citation omitted), the statute was solely remedial.

Chaparral Steel Co. v. United States, 901 F.2d 1097, 1103–04 (Fed. Cir. 1990).

Plaintiffs argue that the changes in the antidumping statute effected by the Byrd

Amendment nullify the remedial nature of the statute and impose a penalty entitling Plaintiffs to

"full due process rights, including a hearing before a neutral judge" because the Fifth

Amendment demands due process where there is a deprivation of "life, liberty or property."
(Pls.' Mem. Supp. Mot. J. Agency R. at 50 (citation omitted)); <u>see</u> 5 U.S.C. § 551 et seq. (1994).
The Government, on the other hand, contends that the "provision for the distribution . . . of
antidumping duties that have been collected to the affected domestic producers does not change
the purpose and remedial aspect of the antidumping law into a punitive one" because:  (1)
"importers continue to be liable for antidumping duties equal to the amount by which the normal
value exceeds the export or constructed export price for the merchandise"; and (2) the
"amendment does not make any changes to existing procedures" regarding how Commerce
determines an importer's antidumping duty liability.  (Def.'s Mem. Opp'n to Mot. J. Agency R.
at 20–21 (citations omitted).)  Finally, Plaintiffs counter that the Government's position that
there has been no change in the magnitude of the duties collected is irrelevant because "a change
in the remedy is a change to . . . the purpose of the law."  (Pls.' Reply Mem. Supp. Mot. J.
Agency R. at 14.)  The court agrees with the Government.


First, the changes made by the Byrd Amendment to the antidumping statute do not
impose upon foreign exporters the types of burdens traditionally found to constitute civil or
criminal penalties and, thus, the consequent necessity of a hearing pursuant to the Fifth
Amendment.  In general, "'A penalty is a sum of money of which the law exacts payment by way
of punishment for the doing of some act that is prohibited, or omitting to do some act that is
required to be done.'"  <u>Brown v. Cummins Distilleries Corp.</u>, 56 F. Supp. 941, 942 (W.D. Ken.
1944) (citation omitted).  As such, the amount of a penalty generally bears no relation to the cost
of remediation of any harm caused by the performance or failure of performance of the act.

United States v. DelBellas, 23 CIT 600, 601 (1999)[20] (noting that in the context of a civil penalty proceeding under 19 U.S.C. § 1592 "there is nothing in the language of [the statute] indicating that the amount of the penalty is in any way related to costs incurred by the government."); see also Cummins Distilleries Corp., 56 F. Supp. at 942 ("In a proceeding of this nature the [Government] has suffered no damages, and the action is not for the purpose of compensation."). Another indicator of whether a statute provides for a penalty is the magnitude of the burden imposed. Indeed, courts have found that a duty may constitute a penalty where it is "enormously in excess of the greatest amount of regular duty ever imposed upon an article of the same nature . . . ." See Helwig v. United States, 188 U.S. 605, 611–13 (1902) (finding that where re-appraisement of imported merchandise resulted in an increased duty of $354.00, and the further "sum" imposed by statute was $9,067.68, such further sum was a penalty because "the amount imposed was so large in proportion to the value of the merchandise imported, as to show beyond doubt that it was a sum imposed not, in fact, as a duty upon an imported article, but as a penalty and nothing else."). Here, the facts do not support a finding of a penalty. First, the amount of the antidumping duty assessed is directly related to the remedial goal of equalizing "competitive conditions[,]" C.J. Tower & Sons, 21 C.C.P.A. at 427, 71 F.2d at 445, and this amount is determined in all respects as it was prior to the adoption of the Byrd Amendment. Second, the

---

[20] DelBellas is one of a line of cases of this court discussing the magnitude of an assessed amount and its relation to actual damage sustained. These cases examined civil penalties to determine whether such penalties constituted "double jeopardy." See, e.g., United States v. Danzler Lumber & Exp. Corp., 16 CIT 1050, 1056, 810 F. Supp. 1277, 1283 (1992) (discussing amount of recovery for violations may be "so excessive as to inflict punishment . . . ."), and United States v. Gordon, 10 CIT 292, 297, 634 F. Supp. 409, 415 (1986) (discussing magnitude of amount assessed as factor in determining remedial effect of statute; and considering relation of damage sustained by society to magnitude of amount assessed, as factor in determining whether statute was remedial or constituted punishment).

magnitude of the duty cannot be said to be so large as to necessarily constitute a penalty, since

the amount assessed following the enactment of the Byrd Amendment is identical to the amount

assessed prior to the amendment's enactment.

Next, Congress itself may determine that a provision not be regarded as a penalty.  See

Helwig, 188 U.S. at 613 ("If it clearly appears that it is the will of Congress that the provision

shall not be regarded as a penalty, the Court must be governed by that will."); see also United

States v. Reorganized CFSI Fabricators of Utah, Inc., 518 U.S. 213, 221 n.5 (1996) (citing

Helwig).  This holds true in situations where Congress determines how funds are to be dispensed.

See Helwig, 188 U.S. at 613 ("Congress may enact that such a provision should not be

considered as a penalty or in the nature of one . . . with reference to the distribution of moneys

thus paid . . . .").  In enacting the changes contained in the Byrd Amendment, Congress

determined that the funds collected were to be distributed to domestic producers.  In support of

its determination, Congress made certain findings[21] including: "continued dumping . . . of

---

[21]    These findings were as follows:

(1) Consistent with the rights of the United States under the World
Trade Organization, injurious dumping is to be condemned and
actionable subsidies which cause injury to domestic industries
must be effectively neutralized.

(2) United States unfair trade laws have as their purpose the
restoration of conditions of fair trade so that jobs and investment
that should be in the United States are not lost through the false
market signals.

(3) The continued dumping or subsidization of imported products
after the issuance of antidumping orders or findings or

(continued...)

imported products after the issuance of antidumping orders . . . can frustrate the remedial purpose

of the laws by preventing market prices from returning to fair levels" and that "United States

trade laws should be strengthened to see that the remedial purpose of those laws is achieved."

Agriculture, Rural Development, Food and Drug Administration and Related Agencies

Appropriations Act of 2000, 106 Pub. L. 387, Title X [Continued Dumping and Subsidy Offset]

§ 1002 (3), (5), 114 Stat. 1549 (2000), as enacted.  In order to effect this purpose, Congress chose

to distribute the collected duties to affected domestic producers in hopes that they "will [not] be

reluctant to reinvest or rehire and may be [able] to maintain pension and health care benefits that

conditions of fair trade would permit.  Similarly, small businesses and American farmers and

ranchers may be [able] to pay down accumulated debt, to obtain working capital, or to otherwise

remain viable."[22]  Id. at (4).  These findings demonstrate that Congress sought to change the

---

[21](...continued)
> countervailing duty orders can frustrate the remedial purpose of the
> laws by preventing market prices from returning to fair levels.
>
> (4) Where dumping or subsidization continues, domestic producers
> will be reluctant to reinvest or rehire and may be unable to
> maintain pension and health care benefits that conditions of fair
> trade would permit. Similarly, small businesses and American
> farmers and ranchers may be unable to pay down accumulated
> debt, to obtain working capital, or to otherwise remain viable.
>
> (5) United States trade laws should be strengthened to see that the
> remedial purpose of those laws is achieved.

H.R. 4461, 106th Cong. (2000), reprinted in 2000 U.S.C.C.A.N . 1549, 1549A–72, 73.

[22]      With or without the Byrd Amendment, the duties imposed by the antidumping
statute are not compensatory in nature because, rather than providing payment for past injury,
they are prospective in nature, 19 U.S.C. § 1675c(b)(4), and used to "equalize competitive
conditions . . . ." C.J. Tower & Sons, 21 C.C.P.A. at 427, 71 F.2d at 445.  The Byrd Amendment
                                                                                                             (continued...)

antidumping law in order to strengthen its remedial purpose. Thus, rather than imposing a penalty on foreign exporters, Congress' enacted purpose was to "strengthen[] . . . the remedial purpose of" the antidumping statute. Id. at (5). Congress having clearly expressed its remedial purpose, this court is bound by its will.

Finally, while courts have found that the antidumping statute, as it existed prior to the enactment of the Byrd Amendment, was remedial in nature and, thus, did not constitute a penalty, these courts did not find that the duties imposed by that statute were the exclusive way in which this remediation could be accomplished. See generally C.J. Tower & Sons, 21 C.C.P.A. at 417, 71 F.2d at 438; Union Camp Corp., 22 CIT at 267, 8 F. Supp. 2d at 842; Chr. Bjelland Seafoods, 16 CIT at 945; Chaparral Steel Co., 901 F.2d at 1097. Prior to the enactment of the

---

[22](...continued)
does not change the prospective nature of these duties, nor does it provide that such funds should be used to compensate affected domestic firms for past injuries. Rather, the funds obtained by these duties are distributed to affected domestic firms for qualifying expenditures:

> The term "qualifying expenditure" means an expenditure incurred
> after the issuance of the antidumping duty finding or order or
> countervailing duty order in any of the following categories:
> (A) Manufacturing facilities.
> (B) Equipment.
> (C) Research and development.
> (D) Personnel training.
> (E) Acquisition of technology.
> (F) Health care benefits to employees paid for by the employer.
> (G) Pension benefits to employees paid for by the employer.
> (H) Environmental equipment, training, or technology.
> (I) Acquisition of raw materials and other inputs.
> (J) Working capital or other funds needed to maintain production.

19 U.S.C. § 1675c(b)(4).

Byrd Amendment, any duties collected were deposited with the Treasury. Now, these same duties are to be collected and distributed to parties affected by dumping. At its base, Plaintiffs argument is that this amended statutory scheme is not remedial because it will not "'equalize competitive conditions between the exporter and American Industries affected . . . .'" (Pls.' Mem. Supp. Mot. J. Agency R. at 49 (citing C.J. Tower).) Congress, however, has concluded otherwise. The wisdom of the manner in which Congress chooses to achieve its "remedial purpose" to "equalize competitive conditions," is not a matter of inquiry for this court. See Hampton, Jr. Co. v. United States, 14 C.C.P.A. 350, 366 (1926) ("Whether the particular statute before us is wise or unwise is not for our consideration. This is a political question, with which courts will not deal. The cure for an unwise and injudicious exercise of its constitutional powers by Congress lies with the people, from whom its members derive their commissions." (citing Springer v. United States, 102 U.S. 586 (1880); Kuttroff, Pickhardt & Co. v. United States, 12 Ct. Cust. App. 299 (1924); McCray v. United States, 195 U.S. 27 (1904))).

## CONCLUSION

For the reasons set forth above, the court concludes that Commerce provided Plaintiffs with adequate notice of the pendency of the administrative review and an adequate opportunity to participate in such review; that Commerce properly clarified to Customs that Plaintiff Huaiyin 30 was not entitled to cash deposits based on antidumping duty margin of 91.5 percent; and that payment of antidumping duties to the domestic industry in accordance with the Byrd Amendment does not transform the antidumping regime into one that imposes a penalty. Thus, the court denies Plaintiffs' motion for judgment upon the agency record and Commere's final

determination is sustained.  Judgment is entered accordingly.


_____

Richard K. Eaton


Dated: April 30, 2002
          New York, New York